### III. CONCLUSION

For the reasons discussed above, we hereby deny the petitions for review.

315 F.3d 325

**Amy BETTIS, et al., Appellants,**

v.

**ISLAMIC REPUBLIC OF IRAN and Iranian Ministry of Information and Security, Appellees.**

**No. 01-7147.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 6, 2002.

Decided Jan. 17, 2003.

Steven R. Perles argued the cause for appellants. With him on the briefs was Thomas F. Fay.

Abigail V. Carter argued the cause for amicus curiae in support of affirmance. With her on the brief were Steven H. Goldblatt, appointed by the court, Lyndsy B. Rutherford, and Stephanie Cotilla.

Before: EDWARDS, ROGERS, and GARLAND, Circuit Judges.

Opinion for the Court Filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In 1985, Father Lawrence M. Jenco, an ordained Catholic priest who was working as the Director of Catholic Relief Services in Beirut, Lebanon, was abducted by Hizbollah, the Islamic terrorist organization. Hizbollah held Fr. Jenco captive for 564 days, and subjected him to near-constant blindfolding, beatings, and psychological torture. Even after Fr. Jenco's release, he remained underweight and weak for a long period, had a changed disposition, and would suffer "flashbacks" to his kidnapping and torture. After Fr. Jenco's death, his estate and family members sued the Islamic Republic of Iran, which had "provided support, guidance, and resources to Hizbollah" in connection with Fr. Jenco's abduction. *Jenco v. Islamic Republic of Iran*, 154 F.Supp.2d 27, 31 (D.D.C.2001). The District Court upheld the claims of Fr. Jenco's estate and his six siblings, awarding over $314 million in compensatory and punitive damages for battery, assault, false imprisonment, and intentional infliction of emotional distress suffered by Fr. Jenco and for intentional infliction of emotional distress suffered by the siblings. The District Court rejected the claims of Fr. Jenco's 22 nieces and nephews, however. The nieces and nephews now appeal. We affirm the judgment of the District Court, because the nieces and nephews are not members of Fr. Jenco's immediate family. *See* RESTATEMENT (SECOND) OF TORTS § 46(2)(a).

## I. BACKGROUND

### A. Father Jenco's Abduction and Captivity

Shortly before 8:00 a.m. on January 8, 1985, five armed men abducted Fr. Jenco as he was on his way to the office of Catholic Relief Services in West Beirut, Lebanon. Hizbollah carried out the kidnapping as part of a widespread terrorist campaign that it conducted during the 1980s. This campaign targeted journalists, university professors, members of the clergy, and United States servicemen. *See, e.g., Wagner v. Islamic Republic of Iran*, 172 F.Supp.2d 128, 131-32 (D.D.C. 2001) (detailing the murder of a Navy officer stationed in Beirut by a Hizbollah suicide bomber); *Sutherland v. Islamic Republic of Iran*, 151 F.Supp.2d 27, 30-38 (D.D.C.2001) (detailing Hizbollah's kidnapping, detention, and torture of an American academic in Beirut); *Polhill v. Islamic Republic of Iran*, No. 00-1798 (TPJ), 2001 U.S. Dist. LEXIS 15322, at *2-*7 (D.D.C. Aug. 23, 2001) (same); *Anderson v. Islamic Republic of Iran*, 90 F.Supp.2d 107, 109-11 (D.D.C.2000) (detailing Hizbollah's kidnapping, detention, and torture of an American journalist in Beirut); *Cicippio v. Islamic Republic of Iran*, 18 F.Supp.2d 62, 63-66 (D.D.C.1998) (detailing Hizbollah's kidnapping, imprisonment, and torture of three male U.S. citizens).

As Hizbollah's prisoner, Fr. Jenco was subjected to inhumane conditions. The District Court described his treatment at some length:

> From the moment he was abducted, Father Jenco was treated little better than a caged animal. He was chained, beaten, and almost constantly blindfolded. His access to toilet facilities was extremely limited, if permitted at all. He was routinely required to urinate in a cup and maintain the urine in his cell. His food and clothing were spare, as was even the most basic medical care.

> He also withstood repeated psychological torture. Most notably, at one point, his captors held a gun to his head and told him that he was about to die. The captors pulled the trigger and laughed as Father Jenco reacted to the small click of the unloaded gun. At other times, the captors misled Fr. Jenco into thinking he was going home. They told

him to dress up in his good clothes, took pictures of him, and then said "ha, ha, we're just kidding."

*Jenco,* 154 F.Supp.2d at 29.

Fr. Jenco's imprisonment also caused great suffering among his family members:

> While Father Jenco was being held prisoner, his many siblings and relatives banded together and fought for his release. The family made a practice of meeting every Monday night to discuss what steps they could take to help secure his release. Family members took on various responsibilities, such as communicating with the public, dealing with the media, maintaining contact with the State Department, and raising money to cover the various costs of such a massive effort.
>
> Andrew Mihelich and John Jenco, both nephews of Fr. Jenco, testified that, because of their massive dedication to free Fr. Jenco, the whole family, in effect, became a hostage in one way or another. As a result, many of the traditional family events, such as birthdays, graduations, or religious holidays were overshadowed – or overlooked altogether – on account of the campaign to free Fr. Jenco. Apart from the campaign, the family felt the very personal loss of not having their beloved relative at many family milestones, such as weddings, births, and baptisms. On the whole, according to John Jenco, the family spent the 19 months of Fr. Jenco's captivity on an emotional roller coaster, never knowing how close or far Fr. Jenco was to being released, not to mention returning home unharmed.
>
> Jenco relatives also testified as to the specific effects that the captivity had o[n] Fr. Jenco's brother, John Jenco. John Jenco Jr. testified that, from the first day of captivity to the last day of his own life, John Jenco Sr. was distraught in a way he had never been

before. He was able to celebrate the return of Fr. Jenco, but was never fully able, according to John Jenco Jr., become himself again. Similarly, Joseph Jenco testified that the stress of the captivity on Verna Mae Mihelich likely was a factor in her premature death.

*Id.* at 31-32. The trial court also found that

> there is significant evidence of emotional distress among the siblings. Joseph Jenco, Fr. Jenco's brother testified as to the great strain the captivity imposed on himself as well as his brothers and sisters.... As well, other witnesses testified as to the stressful and extensive publicity campaign ...; the stress of false alarms that Fr. Jenco had been killed or freed ...; and constant fear that the campaign to free Fr. Jenco might also end up hurting him and the other hostages.

*Id.* at 35.

After Fr. Jenco's release, "he returned to the United States and served as a parish priest until his death on July 19, 1996." *Id.* at 29. The District Court found, however, that even after his return home, Fr. Jenco never fully recovered from the grim experience of his imprisonment:

> Fr. Jenco continued to suffer the effects of his captivity. For a long period after his return, Father Jenco remained underweight and quite weak. Father Jenco's nephew, David Mihelich, testified that his uncle's disposition was noticeably milder, and indeed never returned to its pre-captivity state. As well, Christopher Morales, a Special Agent with the United States Secret Service, became a close friend of Jenco's after interviewing him about his experience in Lebanon. Agent Morales testified that he witnessed Father Jenco have three separate "flashbacks", that is, moments where Jenco appeared to be aloof of his

surroundings and somewhat possessed and disturbed by different images or experiences.... In sum, the last 11 years of Fr. Jenco's life were indelibly marred by his kidnapping and torture. *Id.* at 29-30.

Although the District Court's findings are more precise with respect to the effects of Fr. Jenco's ordeal on his siblings than on his nieces and nephews, there is no dispute that the nieces and nephews suffered emotional distress by virtue of the harm done to their uncle.

## B. The Statutory Framework

Under the Foreign Sovereign Immunities Act ("FSIA"), foreign states generally enjoy immunity from suit in U.S. courts. 28 U.S.C. § 1604 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States...."). However, in 1996 Congress enacted the "terrorism exception" to the FSIA under 28 U.S.C. § 1605(a)(7):

> In 1996, as part of the comprehensive Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, § 221(a), 110 Stat. 1214 (Apr. 24, 1996), Congress amended the FSIA to add a new class of claims for which certain foreign states would be precluded from asserting sovereign immunity. Specifically, the amendment vitiates immunity in cases
>
>> in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources ... for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while act-

ing within the scope of his or her office, employment, or agency[.]

> 28 U.S.C. § 1605(a)(7). In enacting this provision, Congress sought to create a judicial forum for compensating the victims of terrorism, and in so doing to punish foreign states who have committed or sponsored such acts and deter them from doing so in the future. *See Daliberti v. Republic of Iraq,* 97 F.Supp.2d 38, 50 (D.D.C.2000); Molora Vadnais, *The Terrorism Exception to the Foreign Sovereign Immunities Act,* 5 UCLA J. INT'L L. & FOREIGN AFF. 199, 216 (2000).
>
> ....
>
> Section 1605(a)(7) has some notable features which reveal the delicate legislative compromise out of which it was born. First, not all foreign states may be sued. Instead, only a defendant that has been specifically designated by the State Department as a "state sponsor of terrorism" is subject to the loss of its sovereign immunity. § 1605(a)(7)(A). Second, even a foreign state listed as a sponsor of terrorism retains its immunity unless (a) it is afforded a reasonable opportunity to arbitrate any claim based on acts that occurred in that state, and (b) either the victim or the claimant was a U.S. national at the time that those acts took place. § 1605(a)(7)(B).

*Price v. Socialist People's Libyan Arab Jamahiriya,* 294 F.3d 82, 88-89 (D.C.Cir. 2002).

Less than six months after passage of AEDPA, Congress passed an amendment designed to enhance the penalties available in suits implicating 28 U.S.C. § 1605(a)(7). *See* Omnibus Consolidated Appropriations Act, 1997, Pub.L. No. 104-208, § 589, 110 Stat. 3009, 3009-172 (1997) (codified at 28 U.S.C. § 1605 note); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C.1998) (describing amendments to

FSIA); *see also* Naomi Roht-Arriaza, *The Foreign Sovereign Immunities Act and Human Rights Violations: One Step Forward, Two Steps Back?*, 16 BERKELEY J. INT'L L., 71, 82-83 (1998) (discussing the amendment). This provision is known as the "Flatow Amendment," because its sponsor referred to the Flatow family – whose daughter, Alisa, was killed by a Palestinian suicide bomber while studying in Israel – when speaking in support of the statute. Joseph W. Dellapenna, *Civil Remedies for International Terrorism*, 12 DEPAUL BUS. L.J. 169, 256 n.439 (1999-2000); *see also Flatow*, 999 F.Supp. at 6-9 (describing Alisa Flatow's murder). The Flatow Amendment allows for non-economic and punitive damages against an official, employee, or agent of a foreign state designated as "terrorist." *Price*, 294 F.3d at 87; *Flatow*, 999 F.Supp. at 12-13.

In *Price*, we noted that "[t]he FSIA is undoubtedly a jurisdictional statute which, in specified cases, eliminates foreign sovereign immunity and opens the door to subject matter jurisdiction in the federal courts.... There is a question, however, whether the FSIA creates a federal cause of action for torture and hostage taking against foreign states," or only against their "official[s], employee[s], or agent[s]" as specified in the Amendment. 294 F.3d at 87. Two District Court opinions in this circuit have reached different conclusions on the question of whether the Flatow Amendment furnishes a basis for a cause of action against a defendant state. *Compare Roeder v. Islamic Republic of Iran*, 195 F.Supp.2d 140, 171-73 (D.D.C.2002), *with Cronin v. Islamic Republic of Iran*, 2002 WL 31830571, at *8-*9, 2002 U.S. Dist. LEXIS 24115, at *24-*30 (D.D.C. Dec. 18, 2002). Because this question had not been briefed or argued by the parties, the court in *Price* merely "flag[ged] the issue," leaving it for disposition by the District Court in the first instance on remand. *Id.* We need not reach the issue

in this case either, because the District Court did not address the matter, Iran has not appealed the judgments in favor of Fr. Jenco's estate and his siblings, and the instant appeal by the nieces and nephews will be resolved against appellants on different grounds.

## C. The Litigation in District Court

In this case, the parties do not appear to doubt that Iran is a proper defendant, at least with respect to the claims brought by Fr. Jenco's estate and his siblings. Iran has been designated a state sponsor of terrorism by the Secretary of State. *See* 22 C.F.R. § 126.1(d). There is also weighty evidence in the record confirming the involvement of Iran in connection with Fr. Jenco's kidnapping and brutal imprisonment. *Jenco*, 154 F.Supp.2d at 31. Because of Iran's culpability, Fr. Jenco's family brought suit against Iran and the Iranian Ministry of Information and Security ("MOIS") on March 15, 2000. The District Court found that, because of Iran's material support for Hizbollah's hostage taking and torture, the terrorism exception stripped Iran's immunity from suit. It also found the defendants liable "on most, but not all, counts alleged in the plaintiffs' complaint." *Jenco*, 154 F.Supp.2d at 33. The court ultimately awarded over $314 million in compensatory and punitive damages to Fr. Jenco's estate and his siblings. *Id.* at 40.

The District Court rejected the claims of Fr. Jenco's nieces and nephews, who were seeking damages for intentional infliction of emotional distress. The trial court recognized the "tremendous impact that Fr. Jenco's detention had on his nieces and nephews." *Id.* at 36. The court concluded, however, that these family members could not recover under common law because they were not among Fr. Jenco's immediate family. In reaching this deci-

sion, the District Court was guided by § 46 of the RESTATEMENT (SECOND) OF TORTS, which purports to delineate common law claims for "Outrageous Conduct Causing Severe Emotional Distress," as follows:

(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

(2) Where such conduct is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46 (1986).

The District Court noted that in *Sutherland,* another terrorism exception suit, the court allowed the wife of a man whom Hizbollah held hostage for six and a half years to recover damages from Iran for intentional infliction of emotional distress even though the wife was not actually "present" to witness the outrageous conduct against her husband. 151 F.Supp.2d at 50. The "presence" requirement of § 46(2)(a) was construed liberally to include this claim, because the court found that the defendants' intent to cause distress to the wife was quite clear from their conduct. *Id.* In the instant case, however, the District Court held that, although the "presence" requirement could be given a generous reading, the "immediate family" requirement of § 46(2)(a) could not:

[S]ome lines must be drawn, if, for example, "millions of people who are not present . . . watch the torture or murder of the President on television." . . . In hostage cases, this Court finds that the line is best drawn according to the plaintiff's relationship with the victim of the outrageous conduct. That is, to collect for intentional infliction of emotional distress in cases such as this one, the plaintiff need not be present at the place of outrageous conduct, but must be a member of the victim's immediate family.

The Court draws the line with respect to family relationship (and not presence) for two reasons. First, hostage cases are unique in that they implicitly involve a physical separation of the plaintiff from the victim of the outrageous conduct. As a matter of fact, a plaintiff's lack of presence is the *exact source* of his emotional distress. Thus, if the Court were to limit recovery in hostage cases using a "presence" test, plaintiffs would never recover despite there being extremely strong evidence of significant emotional suffering.

Second, comparing the presence test to the family relationship test, courts have been more willing to stretch the boundaries of presence than family relationship.

*Jenco,* 154 F.Supp.2d at 36 (quoting DAN B. DOBBS, THE LAW OF TORTS § 307, at 834 (2000)). And in applying the "immediate family" requirement of § 46(2)(a), the District Court adhered to the traditional definition of that term:

This Court defines one's immediate family as his spouse, parents, siblings, and children. This definition is consistent with the traditional understanding of one's immediate family. *See* Dan B. Dobbs, The Law of Torts, § 310 (2000) (addressing the scope of recovery in consortium claims).

*Jenco,* 154 F.Supp.2d at 36 n. 8. The court then found that the nieces and nephews did not satisfy the requirement. *Id.*

The nieces and nephews now appeal the District Court's decision to deny them recovery for intentional infliction of emotional distress. Because Iran did not enter an appearance, the court appointed the Georgetown University Law Center's Appellate Litigation Program as *Amicus Curiae* to present arguments in support of the District Court's judgment.*

## II. ANALYSIS

The sole issue on appeal is whether the District Court erred in denying Fr. Jenco's nieces and nephews recovery under the Flatow Amendment for intentional infliction of emotional distress caused by outrageous conduct directed at Fr. Jenco, where the requirement for recovery at common law – membership in Fr. Jenco's immediate family – is not met. This question is a matter of law for this court to consider *de novo. See Princz v. F.R.G.,* 26 F.3d 1166, 1169 (D.C.Cir.1994).

▇▇▇ The parties agree that the District Court correctly applied common law (and not local District of Columbia law) to the nieces' and nephews' claims for intentional infliction of emotional distress. The brief of *Amicus Curiae* usefully explains the common law recognized pursuant to the FSIA:

> While there is an argument that state substantive tort law may apply to claims brought under the Flatow Amendment, *see, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 622 n. 11, 103 S.Ct. 2591 [2598 n. 11], 77 L.Ed.2d 46 (1983) (finding that

under the commercial exceptions to the FSIA, "where state law provides a rule of liability governing private individuals, the FSIA requires the application of that rule to foreign states in like circumstances"), district courts performing the traditional choice of law analysis in Flatow Amendment cases have consistently applied federal common law. *See Wagner v. Islamic Republic of Iran,* 172 F.Supp.2d 128, 134-35 (D.D.C.2001) (applying federal common law because other possible choices "would eventually lead in other cases to divergent measures of recovery for essentially identical claims against foreign defendants"); *Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 15 (D.D.C.1998) (applying "interstitial federal common law" because Congress intended "that the federal courts create coherent national standards ... [i]n the interest of promoting uniformity of determinations with respect to the liability of foreign states for the terrorist acts"). Application of federal common law is particularly appropriate because the District of Columbia, which is the dedicated venue for actions against foreign states, *see* 28 U.S.C. § 1391(f)(4), does not recognize solatium damages in wrongful death causes of action while the Flatow Amendment does. *See Runyon v. District of Columbia,* 463 F.2d 1319, 1322 (D.C.Cir.1972) (holding, in a wrongful death case, that "[t]he parties so recovering may not be compensated for their grief"); 28 U.S.C. § 1605 note (specifying that plaintiffs may recover "economic damages, solatium, pain, and suffering, and punitive damages"); *see also Stethem v. Islamic*

---

* FSIA § 1608 states that "[n]o judgment by default shall be entered by a court of the United States ... against a foreign state ... unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608. The Law Center's

efforts to assist the court in its statutory responsibility to evaluate the appellants' claims – both the brief submitted to the court and the oral argument presented by Ms. Abigail V. Carter – have been truly outstanding, for which the court is grateful.

*Republic of Iran,* 201 F.Supp.2d 78, 89 (D.D.C.2002) ("Because the District of Columbia does not recognize claims for loss of solatium, this Court has recognized this cause of action under the federal common law by relying upon the Second Restatement of Torts.").[9]

[9] [I]f District of Columbia law were to govern, neither the nieces nor anyone other than Fr. Jenco himself would recover for intentional infliction of emotional distress. Amicus is aware of no case in the District of Columbia permitting someone other than the direct victim of the outrageous conduct to recover for intentional infliction of emotional distress.

Lacking a developed body of federal common law regarding intentional infliction of emotional distress, courts evaluating such claims under the Flatow Amendment have looked to the Restatements, as well as state decisional law. *See, e.g., Sutherland v. Islamic Republic of Iran,* 151 F.Supp.2d 27, 48-52 (D.C.Cir.2001) (applying the Second Restatement of Torts to plaintiff's intentional infliction of emotional distress claim under the federal common law); *Flatow,* 999 F.Supp. at 30 n. 13 (collecting ALR references on state law recovery for solatium damages)[.]

. . .

In this case, the district court and nieces both rely on section 46 of the Restatement for the substantive law of intentional infliction of emotional distress.

Br. of *Amicus Curiae* at 18-21.

We recognize that some of the cases addressing these FSIA claims refer to "federal common law." Indeed, *Amicus Curiae* does as well. The term "federal common law" seems to us to be a misnomer. Indeed, it is a mistake, we think, to label actions under the FSIA and Flatow Amendment for solatium damages as "federal common law" cases, for these actions are based on *statutory* rights. Without the statute, the claims could not arise. Of course, because these claims are based on a federal statute, their "extent and nature" are "federal questions." *Burks v. Lasker,* 441 U.S. 471, 476, 99 S.Ct. 1831, 1836, 60 L.Ed.2d 404 (1979). But that does not, in this case, "authorize the federal courts to fashion a complete body of federal law." *Id.* at 477, 99 S.Ct. at 1837. Rather, as we note in section II.B., *infra,* because the FSIA instructs that "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606, it in effect instructs federal judges to find the relevant law, not to make it. In doing this, federal judges have looked to the common law of the states to determine the meaning of "intentional infliction of emotional distress." And as we explain more fully below, federal courts in FSIA and Flatow Amendment cases have accepted § 46 of the RESTATEMENT (SECOND) OF TORTS as a proxy for state common law of intentional infliction of emotional distress – as do both appellants and *amicus.*

We will assume, *arguendo,* that the nieces and nephews may proceed against the State of Iran under the Flatow Amendment. We will also accept that, in a case of this sort, "common law," grounded in § 46 of the RESTATEMENT (SECOND) OF TORTS, delineates the controlling substantive law. We hold, however, that Fr. Jenco's nieces and nephews cannot recover damages for intentional infliction of emotional distress, because they are not members of Fr. Jenco's immediate family. In reaching this conclusion, it is unnecessary for us to reach the question left open in *Price, i.e.,* whether the FSIA creates a federal cause of action against foreign states. It is also unnecessary for us to decide whether the nieces and nephews satisfy the "presence" requirements of § 46(2).

## A. The RESTATEMENT (SECOND) OF TORTS § 46(1) – Actions for Direct Harm

■ As noted above, § 46(1) is limited to *direct* (not "third party") actions for outrageous conduct causing severe emotional distress:

> One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46(1). Appellants claim that, although they were not abducted and caused to suffer the physical punishment that Fr. Jenco faced, they nonetheless were direct targets of Hizbollah, Iran, and MOIS during the 564 days of Fr. Jenco's captivity, and thus may seek relief for severe emotional distress under § 46(1). In support of this contention, appellants argue, first, that the kidnapping of Fr. Jenco was used to manipulate his family to put pressure on United States Government officials to advance Iran's political goals, and, second, that disinformation released by Iran during the kidnapping was calculated to distress family members.

The District Court focused solely on § 46(2) in rejecting appellants' claims, implicitly rejecting any suggestion that appellants could seek relief under § 46(1). The District Court clearly did not err in declining to apply § 46(1) to appellants' claims. As *Amicus Curiae* correctly notes,

> If any person that Iran hoped to distress by holding and torturing Fr. Jenco could recover under section 46(1) as a direct victim of Iran's conduct, virtually anyone claiming he or she was affected could recover. Assuming the nieces are correct that "[a] terrorist organization does not expose itself to the wrath of the world community simply to cause emotional distress to only the hostage's 'immediate family'" (Appellants' Br. at 40), anyone whom Iran and MOIS intended to affect – and who was severely distressed – could recover, including neighbors, parishioners, and friends, the U.S. government, and even the world community, in addition to the victim and his immediate family. Such a result would contravene the parameters of the FSIA – "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606 – because it would be contrary to the limits placed on recovery for intentional infliction of emotional distress by the Restatement section 46(2) and the states.

Br. of *Amicus Curiae* at 27-28. We agree.

Moreover, permitting the nieces and nephews to recover under § 46(1) would undermine the limitations imposed on recovery under § 46(2) – most significantly, the "immediate family" requirement. Under appellants' view, anyone who agitated for the hostages' release out of genuine concern, sympathy or grief could claim to be an intended "target," seek redress under § 46(1), and avoid the strictures of § 46(2). Appellants argue that this expansive interpretation of § 46(1) can be avoided by limiting recovery to "family members." This does not work, however, because it defies the terms of § 46, and, also, because there is no good reason to distinguish between aggrieved family members and other equally aggrieved persons under appellants' expansive interpretation of § 46(1). *Cf.* RESTATEMENT § 46(2), cmt. b ("Because of the fear of fictitious or trivial claims, distrust of the proof offered, and the difficulty of setting up any satisfactory boundaries to liability, the law has been slow to afford independent protection to the interest in freedom from emotional distress standing alone.").

Finally, the position espoused by appellants is at odds with the FSIA and the prevailing case law. The statute states that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. As *Amicus Curiae* demonstrates in its brief, appellants can point to no specific line of cases in any jurisdiction that supports their right to recovery under subsection (1). Indeed, the prevailing case law refutes appellants' claim. *See, e.g., Dornfeld v. Oberg,* 503 N.W.2d 115, 119 (Minn.1993) (declining to find reckless driving to be "directed at" any particular motorist within the meaning of the Restatement, in part because "[a]llowing recovery under the present facts would raise the specter that any surviving family member in a car crash caused by a drunk or reckless driver could maintain an action against the driver for intentional infliction of emotional distress").

In support of their argument that subsection (1) should apply in this case, appellants point to *Gill v. Brown,* 107 Idaho 1137, 695 P.2d 1276 (App.1985), for the proposition that a defendant can directly target a plaintiff by striking someone or something, knowing that this conduct will emotionally distress the plaintiff. In *Gill,* the court permitted a married couple to recover for intentional infliction of emotional distress after the defendant allegedly shot and killed their donkey. Although appellants are correct that the defendant in *Gill* targeted the plaintiffs by striking at something dear to them, the donkey was property and not another person with an independent legal right to be free from outrageous conduct. Thus, killing the donkey directly targeted the plaintiffs. *Gill* is therefore consistent with the general rule that courts do not consider a plaintiff to be a direct victim of the defendant's conduct where that conduct more directly targeted another victim. While appellants also cite to district court opinions in cases brought

under the Flatow Amendment, none of the cited opinions purports to hold that family members are direct victims of terrorist conduct who may escape the requirements of subsection (2) by recovering under subsection (1).

It is clear that Fr. Jenco's nieces and nephews are not direct victims under § 46(1). Therefore, the nieces and nephews must satisfy the requirements of § 46(2) in order to gain recovery for intentional infliction of emotional distress.

**B. The RESTATEMENT (SECOND) OF TORTS § 46(2) – "Third–Party" Claims**

■ Section 46(2) provides that:

(2) Where [outrageous conduct causing severe emotional distress] is directed at a third person, the actor is subject to liability if he intentionally or recklessly causes severe emotional distress

(a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or

(b) to any other person who is present at the time, if such distress results in bodily harm.

RESTATEMENT (SECOND) OF TORTS § 46(2). Subsection (2)(a) sets forth the "immediate family" requirement, and subsections (2)(a) and (b) delineate the "presence" requirements. Because appellants do not suggest that their emotional distress resulted in bodily harm, they seek recovery under § 46(2)(a), not § 46(2)(b). Because we affirm the District Court's construction of "immediate family" under subsection (2)(a), we offer no view on the substantive scope of the "presence" requirements under § 46(2).

Appellants claim that the "immediate family" requirement of § 46(2)(a) is satisfied in this case, because "[t]he nieces and nephews were 'near relatives' or 'close as-

sociates' of Fr. Jenco." Appellants' Br. at 47. This, of course, is not the test enunciated in the Restatement. Rather, § 46(2)(a) is perfectly plain in its reference to "immediate family." It does not refer to "family members," "near relatives," "close associates," or persons with whom the victim has "close emotional ties" – rather, it says, plainly, "immediate family." And there is no doubt whatsoever that, in this case, nieces and nephews are not "immediate family" members. Indeed, appellants do not dispute this point. Rather, they claim that § 46(2)(a) should be construed liberally to afford "situational justice." Appellants' Br. at 46. As much as we sympathize with appellants' claims, we have no authority to stretch the law beyond its *clear bounds* to satisfy our sense of justice.

In addressing liability for intentional infliction of emotional distress, the Restatement took a progressive position, seeking to advance the common law of 1965. "Academics, rather than courts, were the prime movers in the development of the tort. . . ." Daniel Givelber, *The Right to Minimum Social Decency and the Limits of Evenhandedness: Intentional Infliction of Emotional Distress by Outrageous Conduct*, 82 COLUM. L.REV. 42, 42 (1982); *see also* Annotation, *Modern Status of Intentional Infliction of Mental Distress as Independent Tort; "Outrage"*, 38 A.L.R.4th 998 § 2, 1985 WL 287349 (1985) ("Recognition of the tort by the drafters of the Restatement stimulated its recognition by the courts, the elements of the tort as described in the Restatement being widely accepted and quoted."). The caveat to § 46 says that "[t]he Institute expresses no opinion as to whether there may not be other circumstances under which [an] actor may be subject to liability for the intentional infliction or reckless infliction of emotional distress." RESTATEMENT (SECOND) OF TORTS § 46, caveat. And the Comment to § 46 observes that the law of

intentional infliction of emotional distress is "still in a stage of development, and the ultimate limits of this tort are not yet determined." RESTATEMENT (SECOND) OF TORTS § 46, cmt. c. However, although the common law today has largely caught up with the Restatement, Br. of *Amicus Curiae* at 21, no cases in any federal or state court go *beyond* the Restatement to define "immediate family" as including nieces and nephews.

The brief of *Amicus Curiae* furnishes an extraordinary survey of the common law of intentional infliction of emotional distress, with a chart showing the law in every state in which the tort has been elucidated. On the basis of this survey, *Amicus Curiae* concludes, correctly, that there is *no case* that has permitted nieces or nephews to recover for third-party intentional infliction of emotional distress. Br. of *Amicus Curiae* at 47. *See also* "Amended Survey of State Law Relating to Recovery for Intentional Infliction of Emotional Distress (Sometimes Called 'The Tort of Outrage')," Br. of *Amicus Curiae* at Addendum. Appellants' counsel conceded at oral argument that, so far as he knew, *no cases* include nieces and nephews in the definition of "immediate family" for the purpose of intentional infliction of emotional distress. Indeed, counsel conceded in oral argument that he was unaware of any cases in any context holding that nieces and nephews come within the well-understood concept of "immediate family."

We reject appellants' suggestion that the commentary to § 46 alters the common law definition of "immediate family." Restatement § 46, cmt. l, in addressing "[c]onduct directed at a third person," says that "the decided cases in which recovery has been allowed have been those in which the plaintiffs have been near relatives, or at least close associates, of the person attacked." Appellants argue that this

"makes it clear that the 'immediate family' requirement was not intended to bar recovery of those who fall outside the definition of that term." Appellants' Br. at 47. None of the examples in the commentary support this claim. Rather, as noted by *Amicus Curiae,*

> [f]ollowing the reference to "near relatives" or "close associates," the commentary explains that "there appears to be no essential reason why a stranger who is asked for a match on the street should not recover when the man who asks for it is shot down before his eyes, at least where his emotional distress results in bodily harm." ... Although no immediate family relationship exists in the example, the stranger is present during the extreme and outrageous conduct and suffers bodily injury from his emotional distress. Because the nieces "do not contend that they suffered bodily harm" (Appellants' Br. at 27 n.1), the commentary to section 46 does not assist them. At most, the commentary suggests that when the plaintiff is present and suffers bodily injury from the severe emotional distress, individuals not within the immediate family may recover damages. Indeed the commentary merely provides a gloss on section 46(2)(b), which permits recovery "to any other person who is present at the time, if such distress results in bodily harm." Restatement § 46(2)(b).

Br. of *Amicus Curiae* at 43-44.

Furthermore, and more importantly, appellants concede that they cannot find a single case supporting their interpretation of "immediate family." In a few limited circumstances, some courts have allowed relatives who either *resided in the same household* with the victim or were *legal guardians* to recover for negligent infliction of emotional distress. *See, e.g., Sullivan v. Ford Motor Co.,* No. 97-CIV-0593, 2000 WL 343777 (S.D.N.Y. Mar. 31, 2000); *Garcia v. San Antonio Housing Auth.,* 859 S.W.2d 78, 81 (Tex. Ct.App.1993); *Kriventsov v. San Rafael Taxicabs, Inc.,* 186 Cal. App.3d 1445, 229 Cal.Rptr. 768 (1986). And, recently, the District Court allowed recovery for intentional infliction of emotional distress to a woman who, although not legally married to the victim, had lived with him for over 20 years in a "bond that was the functional equivalent of marriage." *See Surette v. Islamic Republic of Iran,* 231 F.Supp.2d 260 (D.D.C.2002). In these cases, the parties in issue were members of the victim's household, and they were viewed as the functional equivalents of immediate family members. In this case, however, appellants merely claim that the nieces and nephews enjoyed a close relationship with Fr. Jenco, which is far short of what § 46(2)(a) requires.

To define "immediate family" to embrace nieces and nephews who do not live in the immediate household or have any legal obligation to the victim would stretch the term too far. There is a commonly understood meaning of the term, as reflected in State and common law. Appellants have not pointed to any other source of guidance to which a federal court could properly look in interpreting the FSIA. In seeking to recover, appellants would transform the apparently settled meaning of the Restatement in a manner that would brook few limits, as the nieces and nephews are 22 in number, live in different States, and while suffering emotionally do not claim any further relationship to the victim. Indeed, such expanded recovery in this case might also reduce the fund of Iranian assets accessible in this country to plaintiffs who are more closely related to victims of other cases of Iranian terrorism.

It is not within our authority to extend liability for intentional infliction of emotional distress beyond what has been allowed by the common law or authorized by the statute. To choose to include

nieces and nephews within the definition of "immediate family" over, for example, close friends who may be even more egregiously affected by state-sponsored terrorism, seems to us to be well beyond our appropriate role as judges on the federal bench. First, appellants' claims are, at bottom, *statutory* in nature, founded on the FSIA and the Flatow Amendment. We are obliged, therefore, to apply the statute as written. As noted above, the FSIA provides that a "foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Therefore, we have no free-wheeling commission to construct common law as we see fit. Rather, we are bound to look to state law in an effort to fathom the "like circumstances" to which 28 U.S.C. § 1606 refers. The statute instructs us to find the law, not to make it. And, as we have shown, appellants can find no support for their claims in the established common law. Second, the correct substantive foundation for appellants' claims is § 46(2)(a), which, as we have shown, furnishes the basis for much of the state common law. What is most significant here is that § 46(2)(a) is clear in its terms, at least insofar as the "immediate family" requirement is concerned.

We are mindful that state-sponsored terrorist groups such as Hizbollah transgress all bounds of human decency through the physical and psychological torture of their hostages. However, this fact is not a license for judges to legislate from the bench. Assuming, *arguendo*, that appropriate parties may pursue a cause of action against a foreign state like Iran under the Flatow Amendment, and assuming further that the prevailing common law continues to mirror the requirements of § 46(2)(a), relief in cases of this sort will be limited to "immediate family" members. As the law now stands, the nieces and nephews of a victim have no viable basis for a third-party claim of intentional infliction of emotional distress under the statute.

### III. Conclusion

The nieces and nephews are not direct victims under § 46(1), and they are not "immediate family" members under § 46(2). Therefore, we affirm the judgment of the District Court rejecting appellants' claims for recovery based on intentional infliction of emotional distress.