Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

## FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued May 12, 2003        Decided July 1, 2003

No. 02-5145

DAVID M. ROEDER, ET AL.,
APPELLANTS

v.

ISLAMIC REPUBLIC OF IRAN, ET AL.,
APPELLEES

————

Appeal from the United States District Court
for the District of Columbia
(00cv03110)

————

*V. Thomas Lankford* argued the cause for appellants. With him on the briefs were *William Coffield, Terrance G. Reed, Roark M. Reed*, and *Jonathan S. Massey*.

*Stuart H. Newberger, Michael L. Martinez*, and *Laurel Pyke Malson* were on the brief for *amici curiae* Blake Kilburn, et al. in support of appellants.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*H. Thomas Byron III*, Attorney, U.S. Department of Justice, argued the cause for appellee United States of America. With him on the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Douglas N. Letter*, Litigation Counsel, U.S. Department of Justice.

Before: HENDERSON, RANDOLPH, and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Americans taken hostage in Iran in 1979 and held for 444 days brought a class action on behalf of themselves, and their spouses and children, against the Islamic Republic of Iran and its Ministry of Foreign Affairs. The district court, Sullivan, J., issued a comprehensive opinion and ordered the action dismissed for failure to state a claim. *Roeder v. Islamic Republic of Iran*, 195 F. Supp. 2d 140 (D.D.C. 2002). Among the several issues presented on appeal, the principal question is whether legislation specifically directed at this lawsuit, and enacted while the case was pending in the district court, provided a cause of action for the hostages and their families.

## I.

The district court ably summarized the case and the reasons for its decision:

"Members of this plaintiff class previously attempted to sue Iran, but their claims were dismissed because Congress had not waived Iran's sovereign immunity. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984); *McKeel v. Islamic Republic of Iran*, 722 F.2d 582 (9th Cir. 1983); *Ledgerwood v. State of Iran*, 617 F. Supp. 311 (D.D.C. 1985). In 1996, Congress passed the Federal Anti–Terrorism and Effective Death Penalty Act ("the 1996 Anti-terrorism Act") and the Flatow Amendment, which together waived foreign sovereign immunity and created a cause of action for individuals harmed by state-sponsored acts of terrorism. 28 U.S.C. § 1605(a)(7) and note. With the assistance of their counsel, plaintiffs brought this action under those statutes,

arguing that this new cause of action applied to the 1979 hostage taking in Tehran, and asking for compensatory and punitive damages of $33 billion.

"Iran chose not to defend its actions in this Court, despite its long history of adjudicating claims in this Circuit. *See, e.g.*, *McKesson HBOC, Inc. v. Islamic Republic of Iran*, 271 F.3d 1101 (D.C. Cir. 2001). Plaintiffs therefore proceeded with their claims unopposed, and at plaintiffs' request the Court entered a default judgment on liability on August 13, 2001. The Court scheduled a date for a trial to hear evidence on damages, at which several of the plaintiffs were scheduled to testify about their experiences. The Court did not look lightly upon requiring plaintiffs to relive their terrible ordeal and appreciated the difficulty of both testifying and witnessing such testimony.

"On the eve of trial, however, the State Department, recently made aware of plaintiffs' claims, attempted to intervene, vacate the judgment, and dismiss the suit. Plaintiffs' hopes of recovery were once again placed in jeopardy. The United States argued that the Algiers Accords, the 1980 bilateral agreement between the United States and Iran, by which the hostages' release was secured, and its implementing regulations, contain a prohibition on lawsuits arising out of the hostage-taking at issue here. *See* Govt's Mem. in Supp. of Mot. to Vacate of 10/12/01. Because no act by Congress had specifically abrogated the Accords, the government argued, that agreement precludes plaintiffs' claims and the case should be dismissed. The United States also raised several other arguments interpreting the Foreign Sovereign Immunities Act that this Court lacked jurisdiction to hear plaintiffs' claims, and that plaintiffs' claims should be dismissed on the merits.

"Because of the last-minute nature of the government's [motion] to intervene, rather than deny plaintiffs, many of whom had traveled from distant parts of the country, the opportunity to present their testimony on the record, the Court proceeded with the trial. For two days, the Court heard the harrowing accounts of 444 days spent in captivity

from both the former hostages and their family members. The Court scheduled a later date to hear argument on the government's motions and established a briefing schedule to afford the plaintiffs an opportunity to respond to the government's arguments. The Court also directed plaintiffs' counsel to explain why they had not brought the Algiers Accords to the Court's attention earlier.

"On November 28, 2001, the date that the government's reply brief was due, the case took yet another dramatic turn. The government informed the Court that Congress had recently passed, and the President had signed on that very day, an appropriations bill with a provision amending the Foreign Sovereign Immunities Act that specifically referred to this case. *See* Subsection 626(c) of Pub. L. 107–77, 115 Stat. 748 (2001) ("Subsection 626(c)"). After hearing argument from counsel on the impact of the appropriations rider, this Court expressed its serious concern about the lack of clarity in Congress' recent action.

"After the Court took this case under advisement, Congress acted yet again. On December 20, 2001, Congress passed yet another appropriations rider that added a technical amendment to Subsection 626(c) and contained language in its legislative history purporting to explain the legislative intent behind the earlier Subsection 626(c). *See* Section 208 of the Department of Defense and Emergency Supplemental Appropriations Act, Pub. L. 107–117, 115 Stat. 2230 ("Section 208"). However, . . . while Congress' intent to interfere with this litigation was clear, its intent to abrogate the Algiers Accords was not.

"Were this Court empowered to judge by its sense of justice, the heart-breaking accounts of the emotional and physical toll of those 444 days on plaintiffs would be more than sufficient justification for granting all the relief that they request. However, this Court is bound to apply the law that Congress has created, according to the rules of interpretation that the Supreme Court has determined. There are two branches of government that are empowered to abrogate and rescind the Algiers Accords, and the judiciary is not one of

them. The political considerations that must be balanced prior to such a decision are beyond both the expertise and the mandate of this Court. Unless and until either the legislative or executive branch acts clearly and decisively, this Court can not grant plaintiffs the relief they seek." *Roeder*, 195 F. Supp. 2d at 144–45.

The Algiers Accords, mentioned in the district court's summary, is an executive agreement of importance to this case. In order to secure the hostages' release, the United States froze Iranian government assets, imposed trade sanctions, prosecuted a claim before the International Court of Justice, and undertook a military rescue operation. *See Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 837 n.1 (D.C. Cir. 1984). These efforts failed. On January 19, 1980, the United States entered into the Algiers Accords, settling a broad range of disputes between this country and Iran. *See generally* Iran–United States: Settlement of the Hostage Crisis, 20 I.L.M. 223 (1981). As part of the Accords, the United States agreed to "bar and preclude the prosecution against Iran of any . . . claim of . . . a United States national arising out of the events . . . related to (A) the seizure of the 52 United States nationals on November 4, 1979, [and] (B) their subsequent detention." *Id.*, Declaration of the Government of the Democratic and Popular Republic of Algeria, General Principles, ¶ 11, 20 I.L.M. at 227. The hostages were released the next day. President Carter, on his last full day in office, issued an executive order directing the Secretary of the Treasury to issue regulations implementing this provision, and directing and authorizing the Attorney General to take appropriate measures to notify the judiciary of the Order. Non–Prosecution of Claims of Hostages and for Actions at the United States Embassy and Elsewhere, Exec. Order No. 12,283, 46 Fed. Reg. 7927 (Jan. 19, 1981); *see also* Prohibition Against Prosecution of Certain Claims, 31 C.F.R. § 535.216(a). After the change in administrations, President Reagan ratified this executive order and related ones. Suspension of Litigation Against Iran, Exec. Order No. 12,294, § 8, 46 Fed. Reg. 14,111 (Feb. 24, 1981).

6

## II.

### A.

One of the issues plaintiffs raise is whether the district court erred in permitting the United States to intervene as a defendant. We wonder how a reversal of that ruling would assist plaintiffs. The Foreign Sovereign Immunities Act – FSIA – does not automatically entitle a plaintiff to judgment when a foreign state defaults. The court still has an obligation to satisfy itself that plaintiffs have established a right to relief. 28 U.S.C. § 1608(e). The district court did not mention the Algiers Accords when the default judgment was entered, but that was because plaintiffs' counsel had not alerted the court to the Accords.[1] After the Justice Department informed the court of the Accords, the court performed its duty under § 1608(e) and determined that plaintiffs were not entitled to relief. We see no basis for assuming that the court, having become aware of this impediment to plaintiffs' action, would have reached a different result if it had denied the government's motion to intervene. In other words, even if the Justice Department had appeared only in the capacity of *amicus curiae*, the outcome would not have changed.

At all events it is clear to us that the court properly granted the United States leave to intervene as of right. Federal Rule of Civil Procedure 24(a) provides that an applicant for intervention must file a "timely application" and demonstrate that it has "an interest relating to the property or transaction which is the subject matter of the action" and that "the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties." *See also Smoke v. Norton*, 252 F.3d 468, 470 (D.C. Cir. 2001).

---

[1] The court criticized plaintiffs' counsel for failing to "bring to the Court's attention the Algiers Accords and implementing regulations despite FSIA's requirement that plaintiffs "establish[ed] [their] claim or right to relief by evidence that is satisfactory to the court. 28 U.S.C. § 1608(e)." *Roeder*, 195 F. Supp. 2d at 185 (alterations in original).

The district court correctly analyzed each of these factors. Timeliness is measured from when the prospective intervenor "knew or should have known that any of its rights would be directly affected by the litigation." *Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 433–34 (D.C. Cir. 1989), *rev'd on other grounds sub nom. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990). Here, the government moved to intervene less than thirty days after the State Department received notice of the potential conflict with the executive agreement. As to the government's interest, plaintiffs suppose it is in providing Iran with a defense. That is incorrect. The government's interest is in upholding the Algiers Accords, an interest that would be impaired if plaintiffs obtained a judgment in violation of the Accords. We have already decided that the interest of the United States in meeting "its obligations under the executive agreement with Iran" entitled it to intervene as a defendant. *See Persinger*, 729 F.2d at 837. And because Iran failed to appear before the district court, the interest of the United States was not represented by the existing parties.

Although the government thus satisfied the requirements of Rule 24(a), decisions of this court hold an intervenor must also establish its standing under Article III of the Constitution. *See, e.g.*, *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731–32 (D.C. Cir. 2003); *Bldg. & Constr. Trades Dep't v. Reich*, 40 F.3d 1275, 1282 (D.C. Cir. 1994). The court's opinion in *Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 538 (D.C. Cir. 1999), identified a split in the circuits on the subject of intervenor standing. We were dealing there with intervention in the court of appeals under 28 U.S.C. § 2348. As to intervention in the district court, requiring standing for an applicant wishing to come in on the side of a plaintiff who has standing runs into the doctrine that Article III is satisfied so long as one party has standing. *See, e.g., Watt v. Energy Action Found.*, 454 U.S. 151, 160 (1981); *Am. Soc'y for the Prevention of Cruelty to Animals v. Ringling Bros. & Barnum & Bailey Circus*, 317 F.3d 334, 338 (D.C. Cir. 2003). Requiring standing of someone who seeks to intervene as a defendant, *see Fund for Animals*, 322 F.3d at 730–32, runs

into the doctrine that the standing inquiry is directed at those who invoke the court's jurisdiction. *See Virginia v. Hicks*, 71 U.S.L.W. 4441, 4443 (U.S. June 16, 2003). Still, there is no need to dwell on the issues thus raised. With respect to intervention as of right in the district court, the matter of standing may be purely academic. One court has rightly pointed out that any person who satisfies Rule 24(a) will also meet Article III's standing requirement. *Sokaogon Chippewa Cmty. v. Babbitt*, 214 F.3d 941, 946 (7th Cir. 2000). So here. The United States established that it was in imminent danger of suffering injury in fact – a breach of its obligations under the Accords. There was a "causal connection between the injury and the conduct complained of" and the injury was capable of judicial redress. *Bennett v. Spear*, 520 U.S. 154, 167 (1997). The United States therefore had standing as a defendant-intervenor.

With this much settled, the error of plaintiffs' claim that the United States could not properly move to vacate the default judgment becomes apparent. The United States was not asserting defenses personal to the parties in default – Iran and its Ministry of Foreign Affairs. The government entered the case to assert its own defenses under the Algiers Accords. As an intervenor, the United States "participates on an equal footing with the original parties to a suit." *Bldg. & Constr. Trades Dep't*, 40 F.3d at 1282. The United States therefore had the right to move under Rule 60(b) of the Federal Rules of Civil Procedure to vacate the default judgment against the defendants.

## B.

One other preliminary issue deals with the legal status of Iran's Ministry of Foreign Affairs. The Flatow amendment to the FSIA, set forth at 28 U.S.C. § 1605 note,[2] provides a

---

[2] "An official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent

cause of action against officials, employees, and agents of foreign states. Because it is unclear whether the amendment also provides a cause of action against the foreign state,[3] plaintiffs maintain that the Ministry of Foreign Affairs is merely an agent of Iran, not its alter ego. In *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 149–50 (D.C. Cir. 1994), we concluded that a nation's air force is a "foreign state or political subdivision" rather than an "agency or instrumentality" of the nation for purposes of the service-of-process provisions of the FSIA. "Any government of reasonable complexity must act through men organized into offices and departments." *Id.* at 153. We adopted a categorical approach: if the core functions of the entity are governmental, it is considered the foreign state itself; if commercial, the entity is an agency or instrumentality of the foreign state. A nation's armed forces are clearly on the governmental side. *Id.* For similar reasons, the Ministry of Foreign Affairs must be treated as the state of Iran itself rather than as its agent.[4] The conduct of foreign affairs is an important and "indispensable" governmental function. *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 160 (1963).

for which the courts of the United States may maintain jurisdiction under [28 U.S.C. § 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)]." 28 U.S.C. § 1605 note.

[3] In view of the Flatow amendment's failure to mention the liability of foreign states, it is "far from clear" that a plaintiff has a substantive claim against a foreign state under the Foreign Sovereign Immunities Act. *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002); *see also Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 330 (D.C. Cir. 2003). We have yet to decide the question and see no reason to do so here.

[4] Plaintiffs suggest that the legislative intent expressed in 28 U.S.C. § 1606 and the principles of respondeat superior and ratification create liability for Iran based upon the actions of its Ministry of Foreign Affairs. Because the two defendants are not legally distinct, plaintiffs must show an abrogation of the Algiers Accords to subject either defendant to liability.

### III.

This brings us to the principal issue. The authority of the President to settle claims of American nationals through executive agreements is clear. *See Am. Ins. Ass'n v. Garamendi*, 2003 WL 21433477, at \*11 (U.S. June 23, 2003); *id* at \*23 (Ginsburg, J., dissenting). There is no doubt that laws passed after the President enters into an executive agreement may abrogate the agreement. The question here is whether legislation enacted while the case was pending abrogated the Algiers Accords.

The FSIA provides generally that a foreign state is immune from the jurisdiction of the United States courts unless one of the exceptions listed in 28 U.S.C. § 1605(a) applies. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434–35 (1988). At the time plaintiffs filed their complaint and up to entry of the default judgment of liability, none of the exceptions applied to this case. Section 1605(a)(7)(A), added as part of the Antiterrorism and Effective Death Penalty Act of 1996, allowed an exception to the immunity bar if plaintiffs showed that the foreign state had been designated a state sponsor of terrorism when the act occurred or as a result of the act. 28 U.S.C. § 1605(a)(7)(A) (2000). Iran had not been so designated.

After the United States moved to intervene and vacate the default judgment, Congress amended the FSIA. A provision in an appropriations act stated that § 1605(a)(7)(A) would be satisfied (that is, the immunity of the foreign state would not apply) if "the act is related to Case Number 1:00CV03110(ESG) [sic] in the United States District Court for the District of Columbia." Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations Act, 2002, Pub. L. No. 107–77, § 626(c), 115 Stat. 748, 803 (2001). Six weeks later, Congress corrected an error in the case number: "Section 626(c) of the Departments of Commerce, Justice, and State, the Judiciary and Related Agencies Appropriations Act, 2002 (Public Law No. 107–77) is amended by striking '1:00CV03110(ESG)' and inserting '1:00CV03110(EGS).'" Department of Defense and Emergency Supplemental Appropriations for Recovery from and Response to the Terrorist Attacks on the United States Act, 2002, Pub. L. No. 107–117, Div. B, § 208, 115 Stat. 2230, 2299

(2002) (currently codified at 28 U.S.C.A. § 1605(a)(7)(A) (Supp. 2003)).

Together, these amendments created an exception, for this case alone, to Iran's sovereign immunity, which would otherwise have barred the action. The evident purpose was to dispose of the government's argument, in its motion to vacate, that plaintiffs' action should be dismissed because Iran had not been designated a state sponsor of terrorism at the time the hostages were captured and held, and that Iran's later designation (in 1984) rested not on the hostage crisis but on its support of terrorism outside its borders. Mem. of P. & A. in Supp. of the United States' Mot. to Vacate the Default J. and Dismiss Pls.' Claims at 12–13 (Oct. 12, 2001) [hereinafter "Mot. to Vacate"]; *see also* Determination Pursuant to Section 6(i) of the Export Administration Act of 1979 – Iran, 49 Fed. Reg. 2836 (Jan. 23, 1984).

The question remained whether the Algiers Accords, on which the United States had relied as a second ground for dismissal, Mot. to Vacate at 18–23, survived the amendments. The Accords required the United States to "bar and preclude the prosecution against Iran of any pending or future claim of . . . a United States national arising out of the events . . . related to (A) the seizure of the 52 United States nationals on November 4, 1979, [and] (B) their subsequent detention. . . ." 20 I.L.M. at 227; *cf. Belk v. United States*, 858 F.2d 706, 706 (Fed. Cir. 1988) (affirming summary judgment for the United States in action by some of the plaintiffs here asserting that the barring of their actions by the Accords constituted a taking by the government). The amendments do not, on their face, say anything about the Accords. They speak only to the antecedent question of Iran's immunity from suit in United States courts. Plaintiffs therefore urge us to consider statements in the "Conference Report" on the second appropriations act, which made the technical correction to the case number. These statements, plaintiffs say, show that Congress expressly recognized a conflict between their lawsuit and the Accords and passed the amendments to resolve the conflict in plaintiffs' favor.

Some words about conference reports are in order. After the House and the Senate pass different versions of legisla-

tion, each body appoints conferees to resolve disagreements between the House and Senate bills. If a majority of the conferees from each body agree, they submit two documents to their respective houses: a conference report presenting the formal legislative language and a joint explanatory statement that explains the legislative language and how the differences between the bills were resolved. Each body must vote on approving the conference report in its entirety and may not approve it only in part or offer any amendments. *See generally* STANLEY BACH & CHRISTOPHER M. DAVIS, CONGRESSIONAL RESEARCH SERVICE, CONFERENCE REPORTS AND JOINT EXPLANATORY STATEMENTS (2003).

Plaintiffs told us at oral argument that both houses voted on the language of the conference report. This is accurate. But it is not the conference report – which consists of the text of the legislation – on which plaintiffs rely. The statements they think important are in the joint explanatory statement, which is in the form of a committee report. While both the conference report and the joint explanatory statement are printed in the same document, Congress votes only on the conference report. Courts, including the Supreme Court, have not always been precise about this, referring sometimes to material in joint explanatory statements as the conference report. *See, e.g.*, *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 440 (2002) (quoting the "Joint Explanatory Statement of the Committee of Conference" in H.R. CONF. REP. NO. 103–677, at 87 (1994), and referring to it as the "Conference Report"); *INS v. St. Cyr*, 533 U.S. 289, 317 (2001) (quoting the "Joint Explanatory Statement of the Committee of Conference" in H.R. CONF. REP. NO. 104–828, at 222 (1996), and referring to it as the "Conference Report"); *see also* George A. Costello, *Average Voting Members and Other "Benign Fictions": The Relative Reliability of Committee Reports, Floor Debates, and Other Sources of Legislative History*, 1990 DUKE L.J. 39, 48 ("Almost invariably, courts employ the shorthand 'committee report' when referring to the explanatory statement of the managers . . . ."). We do not say material in the joint explanatory statement is of no value in determining Congress' intent. *See Demby v.*

*Schweiker*, 671 F.2d 507, 510 (D.C. Cir. 1981) (opinion of MacKinnon, J.); *see also Moore v. District of Columbia*, 907 F.2d 165, 175 (D.C. Cir. 1990) (en banc). The point is that contrary to what plaintiffs suggest, the explanatory remarks in the "conference report" do not have the force of law.

The joint explanatory statement relating to Congress' first amendment, § 626(c), contains nothing to indicate that any conferee took account of the Algiers Accords. The only relevant remarks are that the amendment "quashes the State Department's motion to vacate the judgment obtained by plaintiffs in [this case]" and that the United States is not required to "make any payments to satisfy the judgment." H.R. CONF. REP. No. 107–278, at 170 (2001). The motion of course was on behalf of the United States, not the State Department, and it is open to question whether Congress may dictate the outcome of a particular judicial proceeding.[5] We put these matters to the side. The government's motion to dismiss rested not only on plaintiffs' failure to bring their case within one of the exceptions to the general rule of foreign sovereign immunity, but also on the bar set up in the Algiers Accords. The text of § 626(c) is consistent with removing the government's first argument for dismissal. It says nothing about the second.

The joint explanatory statement relating to § 208, which corrected the typographical error in § 626(c), declares that the earlier amendment "quashed" the "Department of State's motion to vacate" and mentions that, in the intervening weeks, the "Department of State" continued to argue that the judgment should be vacated. It then explains the meaning of § 626(c): "The provision . . . acknowledges that, *notwithstanding any other authority*, the American citizens who were taken hostage by the Islamic Republic of Iran in 1979 have a claim against Iran under the Antiterrorism Act of 1996

---

[5] We do not decide whether the amendments, relating as they did specifically to a pending action, violated separation-of-powers principles by impermissibly directing the result of pending litigation. *See Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (1995); *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 441 (1992).

and the provision specifically allows the judgment to stand. . . ." H.R. CONF. REP. NO. 107–350, at 422–23 (2001) (emphasis added). This statement, and the italicized language in particular, is the type of language that might abrogate an executive agreement – if the statement had been enacted. But Congress did not vote on the statement and the President did not sign a bill embodying it.[6]

There is thus no clear expression in anything Congress enacted abrogating the Algiers Accords. Yet neither a treaty nor an executive agreement will be considered " 'abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed.' " *Trans World Airlines v. Franklin Mint Corp.*, 466 U.S. 243, 252 (1984) (quoting *Cook v. United States*, 288 U.S. 102, 120 (1933)); *see Weinberger v. Rossi*, 456 U.S. 25, 32 (1982); *Comm. of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 936–37 (D.C. Cir. 1988). The way Congress expresses itself is through legislation. While legislative history may be useful in determining intent, the joint explanatory statements here go well beyond the legislative text of § 208, which did nothing more than correct a typographical error. Moreover, the explanatory statements, rather than explain the language of § 208, deal with the previously enacted § 626(c). Such legislative history alone cannot be sufficient to abrogate a treaty or an executive agreement. *See Gray Panthers Advocacy Comm. v. Sullivan*, 936 F.2d 1284, 1288 (D.C. Cir. 1991).

Courts have insisted on clear statements from Congress in other contexts. These include a waiver of federal sovereign immunity, *see United States v. Nordic Village, Inc.*, 503 U.S.

---

[6] Upon signing the first appropriations act, President Bush stated: "the Executive Branch will act, and encourage the courts to act, with regard to Subsection 626(c) of the bill in a manner consistent with the obligations of the United States under the Algiers Accords. . . ." Statement by President George W. Bush Upon Signing H.R. 2500, 2002 U.S.C.C.A.N. 886, 887 (Nov. 28, 2001). In signing the bill containing the technical correction, the President issued a similar statement. *See* Statement by President George W. Bush Upon Signing H.R. 3338, 2002 U.S.C.C.A.N. 1776, 1778–79 (Jan. 10, 2002).

30, 33–34 (1992); retroactivity of statutes, *see Landgraf v. USI Film Products*, 511 U.S. 244, 271–72 (1994); repeal of habeas jurisdiction, *see St. Cyr*, 533 U.S. at 298–99; waiver of Eleventh Amendment immunity, *Dellmuth v. Muth*, 491 U.S. 223, 230–31 (1989); and a significant alteration in the balance of power between Congress and the President, *see Armstrong v. Bush*, 924 F.2d 282, 289 (D.C. Cir. 1991). In *Dellmuth*, a case dealing with a waiver of Eleventh Amendment immunity, the Court held that if "Congress' intention is 'unmistakably clear in the language of the statute,' recourse to legislative history will be unnecessary; if Congress' intention is not unmistakably clear, recourse to legislative history will be futile . . . ." 491 U.S. at 230. Executive agreements are essentially contracts between nations, and like contracts between individuals, executive agreements are expected to be honored by the parties. Congress (or the President acting alone) may abrogate an executive agreement, but legislation must be clear to ensure that Congress – and the President – have considered the consequences. The "requirement of clear statement assures that the legislature has in fact faced, and intended to bring into issue, the critical matters involved in the judicial decision." *Gregory v. Ashcroft*, 501 U.S. 452, 461 (1991). The kind of legislative history offered here cannot repeal an executive agreement when the legislation itself is silent. *See Comm. of United States Citizens*, 859 F.2d at 936–37.

As against this, plaintiffs say that we should not presume that Congress, in passing the amendments, did "a futile thing." *Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997). But we are presuming no such thing. The amendments were not futile acts. If constitutional, *see supra* note 5, the amendments had the effect of removing Iran's sovereign immunity, which the United States had raised in its motion to vacate. This enabled plaintiffs to argue that the Accords were not a valid executive agreement.[7] Plaintiffs in

---

[7] For example, a member of the panel at oral argument raised the question whether an international agreement is binding if it is not

fact made this argument in the district court (but they do not make it here). *See* Pls.' Supplemental Brief at 9–12 (Jan. 22, 2002); 195 F. Supp. 2d at 168. That the district court rejected the argument is of no moment. Plaintiffs' opportunity to have it decided resulted directly from the amendments.

Plaintiffs also cite § 2002 of the Victims of Trafficking and Violence Protection Act of 2000, Pub. L. No. 106–386, § 2002, 114 Stat. 1464, 1541–42, to show that they have stated a cause of action. Section 2002 states only that if an individual has a judgment against Iran, the United States will pay it if the statutory requirements are satisfied. The question in this case is whether plaintiffs are legally entitled to such a judgment. We agree with the district court that they are not.

We have considered plaintiffs' other arguments but see no need to set forth our reasons for rejecting them.

*Affirmed*.

---

entered into voluntarily but "at the point of a gun" to obtain release of the hostages.