Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 7, 2004                Decided June 4, 2004

No. 03-5232

CLIFFORD ACREE, COLONEL, ET AL.,
APPELLEES

v.

REPUBLIC OF IRAQ, ET AL.,

UNITED STATES OF AMERICA,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 02cv00632)

*Gregory G. Katsas*, Deputy Assistant Attorney General, U.S. Department of Justice, argued the cause for appellant. With him on the brief were *Peter D. Keisler*, Assistant Attorney General, *Roscoe C. Howard, Jr.*, U.S. Attorney,

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Douglas N. Letter*, *H. Thomas Byron, III*, *Douglas Hall-ward–Driemeier*, and *Lewis Yelin*, Attorneys.

*Stewart A. Baker* argued the cause for appellee Clifford Acree, et al. With him on the brief were *Stephen A. Fennell, Bennett Evan Cooper*, and *John Norton Moore*.

*Daniel J. Popeo* and *Paul D. Kamenar* were on the brief for *amici curiae* in support of appellees.

Before: EDWARDS, TATEL, and ROBERTS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Opinion concurring in part and concurring in the judgment filed by *Circuit Judge* ROBERTS.

EDWARDS, *Circuit Judge*: Appellees in this case are 17 American soldiers, joined by their close family members, who were captured and held as prisoners of war by the Iraqi Government while serving in the Gulf War in early 1991. Appellees brought suit in the District Court under the terrorism exception to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. § 1605(a)(7) (2000), against the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein, in his official capacity as President of Iraq (collectively "Iraq"), seeking compensatory and punitive damages for the horrific acts of torture they suffered during their captivity. After Iraq failed to appear, the District Court examined appellees' evidentiary submissions and entered judgment in their favor. The District Court awarded damages against Iraq totaling over $959 million. *See Acree v. Republic of Iraq*, 271 F. Supp. 2d 179 (D.D.C. 2003) ("*Acree I*").

Two weeks after the District Court entered its judgment for appellees, the United States filed a motion to intervene for the purpose of contesting the District Court's subject matter jurisdiction. The United States argued that recently enacted provisions of the Emergency Wartime Supplemental Appropriations Act, Pub. L. No. 108–11, § 1503, 117 Stat. 559, 579 (2003), made the terrorism exception to the FSIA inapplicable to Iraq and thereby stripped the District Court of its jurisdiction over appellees' lawsuit. The District Court denied the

United States' motion to intervene as untimely, *see Acree v. Republic of Iraq*, 276 F. Supp. 2d 95 (D.D.C. 2003) ("*Acree II*"), and the United States now appeals.

We hold that the District Court abused its discretion in finding the United States' motion to intervene to be untimely and erred in denying that motion. The United States possesses weighty foreign policy interests that are clearly threatened by the entry of judgment for appellees in this case. Although the United States filed its motion after the District Court had entered its judgment, appellees have asserted no prejudice arising from the intervention. On the merits of the United States' jurisdictional challenge, we hold that the District Court properly exercised jurisdiction in appellees' lawsuit. Although it presents a close question of statutory interpretation, we conclude that the disputed language in the emergency supplemental appropriations act does not encompass the terrorism exception to the FSIA.

We nevertheless conclude that the District Court's judgment in favor of appellees must be vacated and their lawsuit dismissed for failure to state a cause of action. The District Court's judgment against Iraq rests solely on causes of action purportedly arising under the terrorism exception and the Flatow Amendment to the FSIA. Neither appellees' complaint, nor their submissions to this court, nor the District Court's decision in their favor offers any other coherent alternative causes of action in support of appellees' claims against Iraq. Our recent decision in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024 (D.C. Cir. 2004) ("*Cicippio*"), makes it plain that the terrorism exception to the FSIA is merely a jurisdictional provision and does not provide a cause of action against foreign states. *Cicippio* also holds that the Flatow Amendment to the FSIA, which provides a cause of action against an "official, employee, or agent of a foreign state," 28 U.S.C. § 1605 note (2000), does not afford a cause of action against a foreign state itself. We are therefore constrained to vacate the judgment of the District Court and dismiss appellees' suit for failure to state a cause of action.

## I.  Background

### A.  The POW Lawsuit

The facts in this case are undisputed.  While serving in the Gulf War following the Iraqi invasion of Kuwait, Colonel Clifford Acree and 16 other American soldiers who are appellees in this case were captured and held as prisoners of war in Kuwait and the Republic of Iraq between January and March 1991.  On April 4, 2002, these POWs and their close family members filed a complaint in the District Court against the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein, in his official capacity as President of Iraq, for personal injuries caused to them and their family members as a result of their treatment by Iraq.  In their complaint, the POW plaintiffs described brutal and inhumane acts of physical and psychological torture suffered during their captivity, including severe beatings, starvation, mock executions, dark and unsanitary living conditions, and other violent and shocking acts.  By these alleged atrocities, the plaintiffs' captors created a "climate [of] humiliation and degradation," in which the POWs "liv[ed] in constant fear of death and torture."  Compl. ¶ 5, *reprinted in* Joint Appendix ("J.A.") 35.

Jurisdiction in the plaintiffs' lawsuit was based on the terrorism exception to the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7).  Under the FSIA, foreign states enjoy immunity from suit in American courts, unless that immunity has been waived or abrogated pursuant to an exception enumerated in the FSIA.  *See* 28 U.S.C. § 1604; *see also* 28 U.S.C. § 1330(a) (limiting the district courts' jurisdiction over suits against foreign states to cases in which the foreign state is not entitled to immunity under the FSIA).  Section 1605(a)(7), added to the FSIA in 1996, creates an exception to foreign sovereign immunity in civil suits "in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture" or other terrorist acts.  28 U.S.C. § 1605(a)(7).  This exception applies only if the defendant foreign state was designated as a state sponsor of terrorism at the time the alleged acts of torture

occurred. *See* 28 U.S.C. § 1605(a)(7)(A). Pursuant to § 6(j) of the Export Administration Act, 50 U.S.C. App. § 2405(j) (1988 & Supp. I 1989), the Republic of Iraq was designated as a state sponsor of terrorism on September 13, 1990, shortly after the Iraqi invasion of Kuwait and before the events took place that formed the basis of the plaintiffs' claims. *See* 55 Fed. Reg. 37,793 (Sep. 13, 1990). Iraq was therefore amenable to suit in federal court under the FSIA at the time the plaintiffs commenced their lawsuit.

Citing several decisions of the District Court, the plaintiffs – appellees herein – premised their cause of action on § 1605(a)(7), as amended by the so-called "Flatow Amendment," which was adopted shortly after § 1605(a)(7) was added to the FSIA in 1996. *See* Compl. ¶ 596, J.A. 143. The Flatow Amendment provides that:

> [A]n official, employee, or agent of a foreign state designated as a state sponsor of terrorism . . . while acting within the scope of his or her office, employment, or agency shall be liable to a United States national or the national's legal representative for personal injury or death caused by acts of that official, employee, or agent for which the courts of the United States may maintain jurisdiction under [§ 1605(a)(7)] for money damages which may include economic damages, solatium, pain, and suffering, and punitive damages if the acts were among those described in [§ 1605(a)(7)].

28 U.S.C. § 1605 note. Appellees alleged that the acts of torture set forth in their complaint constituted "traditional torts of assault, battery and intentional infliction of emotional distress," Compl. ¶ 597, J.A. 143, and requested compensatory and punitive damages for each of the POW plaintiffs and their family members.

Appellees effected proper service of process through diplomatic channels, pursuant to 28 U.S.C. § 1608. The Iraqi defendants failed to appear, and the Clerk of the District Court accordingly entered default against the defendants on

September 25, 2002. On March 31, 2003, appellees submitted evidence to support their assertion of liability and claim for damages. These submissions provided further details regarding the factual basis of appellees' claims and again asserted the existence of a cause of action based on § 1605(a)(7), as amended by the Flatow Amendment, for assault, battery, and intentional infliction of emotional distress. *See* Pls.' Proposed Findings of Fact and Conclusions of Law at 80–90.

On July 7, 2003, the District Court entered final judgment in favor of appellees. *See Acree I*, 271 F. Supp. 2d 179. The District Court held that "[s]uits brought under § 1605(a)(7) may be based on conventional common law torts." *Id.* at 215. Based on extensive findings of fact regarding the specific injuries suffered by each plaintiff, the District Court awarded compensatory and punitive damages to all of the POW plaintiffs and their family members totaling over $959 million. *Id.* at 224–25.

**B. Legal and Military Developments in Iraq**

As the proceedings in the District Court were running their course, the legal and military situation in Iraq was changing rapidly. In connection with Iraq's designation as a state sponsor of terrorism in September 1990, Congress had passed various statutes imposing sanctions on Iraq and prohibiting the United States Government and private parties from sending assistance to Iraq or conducting business or trade with Iraq. Most notably, Congress enacted the Iraq Sanctions Act of 1990, which condemned the Iraqi invasion of Kuwait and provided for the maintenance of a trade embargo and economic sanctions against Iraq. *See* Pub. L. No. 101–513, §§ 586–586J, 104 Stat. 1979, 2047–55 (1990) (codified at 50 U.S.C. § 1701 note (2000)) ("ISA"). These provisions required that all assistance, exports, loans, credits, insurance, or other guarantees be denied to Iraq, with exceptions for limited humanitarian relief. Section 586F(c) of the ISA also required full enforcement against Iraq of § 620A of the Foreign Assistance Act of 1961, which prohibits the grant of any assistance to any country determined by the Secretary of

State to have "repeatedly provided support for acts of international terrorism," Pub. L. No. 87–195, § 620A, *as added* Pub. L. No. 94–329, § 303, 90 Stat. 729, 753 (1976) (codified as amended at 22 U.S.C. § 2371) ("FAA"). Along with the FAA, the ISA required that several other enumerated provisions of law be fully enforced against Iraq, as well as "all other provisions of law that impose sanctions against a country which has repeatedly provided support for acts of international terrorism." ISA § 586F(c), 104 Stat. 1979, 2051.

Both the Iraq Sanctions Act and the Foreign Assistance Act provide for rescission of the prohibitions they impose on aid to Iraq and other designated states, but only after the President certifies to Congress that there has been a fundamental change in the government or policies of the designated state and that the leadership is no longer supporting acts of terrorism. *See* ISA § 586H, 104 Stat. 1979, 2052–53; FAA, 22 U.S.C. § 2371(c) (2000). A similar certification is required to rescind the Secretary of State's determination under the Export Administration Act that Iraq is a country that has repeatedly provided support for acts of international terrorism. *See* 50 U.S.C. App. § 2405(j)(4) (2000).

Shortly after the commencement of the most recent military action against Iraq in 2003, which resulted in the ouster of Saddam Hussein's regime, the United States' policy toward Iraq changed to reconstructing Iraq's government and rebuilding the country's infrastructure. In furtherance of these new objectives, Congress took several steps to eliminate restrictions on the ability of the United States Government and private parties to provide assistance to or conduct business with Iraq. In April 2003, Congress enacted the Emergency Wartime Supplemental Appropriations Act ("EWSAA" or "Act"), which appropriated additional funding for military operations in Iraq, homeland security efforts in the United States, and bilateral economic assistance to America's allies in the war in Iraq. *See* Pub. L. No. 108–11, 117 Stat. 559 (2003). The bulk of the $78.5 billion appropriated in this Act was allocated to national defense activities. In addition, the Act appropriated nearly $2.5 billion for a new Iraq Relief and Reconstruction Fund, to be used for the development of

physical and government infrastructure and humanitarian activities in Iraq. *See* H.R. Conf. Rep. No. 108–76, at 70–72 (2003). The Act provided that assistance to Iraq under the Iraq Relief and Reconstruction Fund and other aid programs could be provided "notwithstanding any other provision of law." *See* EWSAA § 1502, 117 Stat. 559, 578.

Of particular relevance to this appeal, § 1503 of the EWSAA authorized the President to "suspend the application of any provision of the Iraq Sanctions Act of 1990." EWSAA § 1503, 117 Stat. 559, 579. Section 1503 "[p]rovided further, [t]hat the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism." *Id.* The suspension of these provisions would permit American assistance to Iraq to proceed without awaiting completion of the lengthy certification process required to rescind the Secretary of State's previous determination as to Iraq's status as a sponsor of terrorism.

On May 7, 2003, President Bush carried out the authority granted in § 1503 of the EWSAA by issuing Presidential Determination No. 2003–23, which "ma[d]e inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 . . . and any other provision of law that applies to countries that have supported terrorism." Presidential Determination No. 2003–23 of May 7, 2003, 68 Fed. Reg. 26,459 (May 16, 2003). In a message to Congress delivered on May 22, 2003, President Bush explained the need to protect Iraqi assets from attachment, judgment, or other judicial process, and stated his view that the May 7 Determination applied to, *inter alia*, the terrorism exception to the FSIA, 28 U.S.C. § 1605(a)(7). *See* Message to the Congress Reporting the Declaration of a National Emergency With Respect to the Development Fund for Iraq, 39 Weekly Comp. Pres. Doc. 647, 647–48 (May 22, 2003).

## C. The United States' Motion to Intervene

On July 21, 2003, two weeks after the District Court entered judgment for appellees, the United States moved to intervene for the sole purpose of contesting the subject

matter jurisdiction of the District Court. This challenge rested on legal developments that had occurred in the wake of the United States' invasion of Iraq in March 2003. The United States argued that § 1605(a)(7) is a "provision of law that applies to countries that have supported terrorism" within the meaning of § 1503 of the EWSAA, as implemented by the May 7 Presidential Determination, and was therefore made inapplicable to Iraq by operation of those provisions. The District Court, the Government argued, was therefore divested of jurisdiction over appellees' lawsuit as of May 7, 2003, two months prior to the entry of judgment against the Iraqi defendants.

On August 6, 2003, the District Court denied the Government's motion to intervene as untimely. *See Acree II*, 276 F. Supp. 2d at 98–99. The District Court noted that the United States had waited 75 days after the Presidential Determination to file its motion, and the court was particularly reluctant to permit the Government to intervene after appellees' case had proceeded to final judgment. *See id.* The District Court further held that, even if the United States' motion was not untimely, appellees' lawsuit did not threaten to impair any cognizable interest of the United States and that allowing the Government to intervene at that late stage would cause undue delay and prejudice to the parties. *See id.* at 99–102. Finally, the District Court considered its own subject matter jurisdiction and concluded that it retained jurisdiction under the FSIA, despite the EWSAA and the Presidential Determination. *See id.* at 100–01. On August 22, 2003, the United States filed this appeal of the District Court's decision.

### D.   Related Developments

Just before the United States moved to intervene, appellees filed a second suit in the District Court against the Secretary of the Treasury, seeking to satisfy their newly won judgment against Iraq by attaching funds from seized Iraqi bank accounts, pursuant to the Terrorism Risk Insurance Act of 2002 ("TRIA"). *See Acree v. Snow*, 276 F. Supp. 2d 31 (D.D.C. 2003). Section 201(a) of the TRIA provides that a person

who has obtained a judgment against a foreign state designated as a state sponsor of terrorism may seek to attach the blocked assets of that state in satisfaction of an award of compensatory damages based on an act of terrorism. *See* Pub. L. No. 107–297, § 201, 116 Stat. 2322, 2337 (2002) (codified at 28 U.S.C. § 1610 note). Although appellees initially prevailed in obtaining a temporary restraining order, precluding the Secretary of the Treasury from spending down the United States' seized Iraqi assets, the District Court ultimately awarded summary judgment to the United States. *See Acree v. Snow*, 276 F. Supp. 2d at 33. The District Court held that § 1503 of the EWSAA, as implemented by the May 7 Determination, made the TRIA inapplicable to Iraq and therefore unavailable to appellees as a mechanism for satisfying their judgment. *See id.* at 32–33.

This court affirmed the decision of the District Court by judgment. *See Acree v. Snow*, No. 03–5195 (D.C. Cir. Oct. 7, 2003). The court did not address the applicability or effect of the EWSAA and the Presidential Determination, however. Rather, the court adopted the reasoning of the Second Circuit's decision in *Smith v. Federal Reserve Bank of New York*, 346 F.3d 264 (2d Cir. 2003). In that case, the Second Circuit held that plaintiffs proceeding under the TRIA to attach seized Iraqi assets in satisfaction of a judgment were precluded from doing so because the President had previously confiscated the blocked assets and vested title in them in the United States Department of the Treasury, thereby rendering those funds insusceptible to execution or attachment. *See id.* at 272 (discussing Exec. Order No. 13,290 of Mar. 20, 2003, 68 Fed. Reg. 14,307 (Mar. 24, 2003)). The Second Circuit – and by extension this court – therefore did not reach the issue of whether § 1503 or the Presidential Determination made the TRIA inapplicable to Iraq and expressed no views on the scope or validity of those provisions. *See id.*

In another important development, this court issued its decision in *Cicippio*, 353 F.3d 1024, three months before oral argument in this case. That case presented the question whether 28 U.S.C. § 1605(a)(7) or the Flatow Amendment, 28 U.S.C. § 1605 note, created a cause of action against a foreign

state. Several decisions in the District Court had held or assumed that these provisions did create a cause of action against foreign states. *See Cicippio*, 353 F.3d at 1032 (citing cases). The court of appeals had not previously affirmed any of these judgments, however, or otherwise squarely confronted the issue. *See Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 234 n.3 (D.C. Cir. 2003) (noting that it is "far from clear" whether a plaintiff has a cause of action against a foreign state under the FSIA, but resolving the appeal on other grounds); *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 333 (D.C. Cir. 2003) (raising but not resolving the question of whether the FSIA creates a cause of action against foreign states); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002) ("There is a question . . . whether the FSIA creates a federal cause of action for torture and hostage taking *against foreign states*.") (emphasis in original).

In *Cicippio*, this court definitively ruled that "neither 28 U.S.C. § 1605(a)(7) nor the Flatow Amendment, nor the two considered in tandem, creates a private right of action against a foreign government." 353 F.3d at 1033. We held that § 1605(a)(7) merely waived the immunity of foreign states, without creating a cause of action against them, and that the Flatow Amendment provides a cause of action only against officials, employees, and agents of a foreign state, not against the foreign state itself. *See id.* We further held that "insofar as the Flatow Amendment creates a private right of action against officials, employees, and agents of foreign states, the cause of action is limited to claims against those officials in their *individual*, as opposed to their official, capacities." *Id.* at 1034. Because of its clear relevance to the instant case, in which the only named defendants are the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein in his official capacity as President of Iraq, we ordered the parties here to consider the implications of our ruling in *Cicippio* for appellees' suit and to be prepared to discuss the issue at oral argument. *See Acree v. Republic of Iraq*, No. 03–5232 (D.C. Cir. Apr. 5, 2004).

## II.  ANALYSIS

This case requires us to consider whether § 1503 of the EWSAA, as implemented by the May 7 Presidential Determination, makes the terrorism exception to the FSIA inapplicable with respect to Iraq.  While it is a close question, we agree with appellees that 28 U.S.C. § 1605(a)(7) is not a provision of law that falls within the scope of § 1503.  The District Court therefore properly exercised jurisdiction over appellees' lawsuit under the FSIA.  Having reached this conclusion, we need not address the additional issues debated by the parties concerning the retroactive scope and constitutional validity of § 1503 and the Presidential Determination.

Although we find that the District Court had jurisdiction in this matter, the judgment for appellees must nonetheless be vacated.  This court's recent decision in *Cicippio* makes it clear that plaintiffs cannot state a cause of action against a foreign state under § 1605(a)(7) or the Flatow Amendment, the sole bases for appellees' action in this case.  Although *Cicippio* was decided after the District Court's judgment in this case, it is nonetheless the controlling precedent to which we must look in determining whether appellees have stated a cause of action.  Because appellees' action fails under *Cicippio*, we conclude that the District Court's judgment in favor of appellees must be vacated and their suit dismissed for failure to state a cause of action.

Before reaching any of these merits issues, however, we must consider the propriety of the District Court's order denying the United States' motion to intervene.  For, in any appeal, "'the first and fundamental question is that of jurisdiction, first, of [the appellate] court, and then of the court from which the record comes.'"  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Great S. Fire Proof Hotel Co. v. Jones*, 177 U.S. 449, 453 (1900)).  If the United States were not properly a party to this case, then it would have no right to appeal the District Court's judgment, *see Marino v. Ortiz*, 484 U.S. 301, 304 (1988), and we would be required to dismiss this case without passing upon its merits for lack of a proper appellant.

## A. The Motion to Intervene

The District Court's denial of a motion to intervene is an appealable final order. *See Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003). Our standard of review in such an appeal is mixed. We review pure questions of law *de novo*, findings of fact for clear error, and discretionary issues such as timeliness for abuse of discretion. *See id.* In this case, we find that the District Court abused its discretion in finding the United States' motion to be untimely and erred in denying the motion.

Under Rule 24 of the Federal Rules of Civil Procedure, a prospective intervenor must be permitted to intervene as of right if the applicant claims an interest relating to the subject matter of the case, if the disposition of the case stands to impair that interest, and if the applicant's interest is not adequately represented by the existing parties. *See* FED. R. CIV. P. 24(a). Alternatively, an applicant may be permitted to intervene if his claim shares a question of law or fact in common with the underlying action and if the intervention will not unduly delay or prejudice the rights of the original parties. *See* FED. R. CIV. P. 24(b). Under either test, the prospective intervenor's motion must be "timely." *See* FED. R. CIV. P. 24(a), (b). Evaluation of the timeliness of a motion to intervene lies within the sound discretion of the District Court. *See Fund for Animals*, 322 F.3d at 732 (citing *Mass. Sch. of Law at Andover, Inc. v. United States*, 118 F.3d 776, 779 (D.C. Cir. 1997) ("*MSL*")).

Courts are generally reluctant to permit intervention after a suit has proceeded to final judgment, particularly where the applicant had the opportunity to intervene prior to judgment. *See Associated Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1257 (D.C. Cir. 1999); *MSL*, 118 F.3d at 783 n.5; *see also* 7C CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1916 (2d ed. 1986) ("WRIGHT & MILLER"). The timeliness of a motion to intervene must be considered in light of all the circumstances of the case, however, *see* WRIGHT & MILLER § 1916, including the purpose for which intervention is sought, the need for intervention as a means of

preserving the applicant's rights, and the possibility of prejudice to the existing parties, *see Smoke v. Norton*, 252 F.3d 468, 471 (D.C. Cir. 2001) (quoting *United States v. AT&T*, 642 F.2d 1285, 1295 (D.C. Cir. 1980)). Post-judgment intervention is often permitted, therefore, where the prospective intervenor's interest did not arise until the appellate stage or where intervention would not unduly prejudice the existing parties. *See* WRIGHT & MILLER § 1916. In particular, courts often grant post-judgment motions to intervene where no existing party chooses to appeal the judgment of the trial court. *See id.*

In *Smoke*, we reversed the District Court's denial of a post-judgment motion to intervene where the existing party indicated it might not bring an appeal. *See* 252 F.3d at 470–71. In doing so, we noted that the would-be intervenor's interests, which had been consonant with those of the existing party, were no longer adequately represented by that party's litigation of the case. *See id.* at 471. In those circumstances, we found the post-judgment motion to intervene for the purpose of prosecuting an appeal to be timely, because "'the potential inadequacy of representation came into existence only at the appellate stage.'" *Id.* (quoting *Dimond v. District of Columbia*, 792 F.2d 179, 193 (D.C. Cir. 1986)); *see also United Airlines, Inc. v. McDonald*, 432 U.S. 385, 395 (1977) (holding that the trial court erred in denying as untimely a post-judgment motion to intervene filed promptly after judgment and noting that this holding was "consistent with several decisions of the federal courts permitting post-judgment intervention for the purpose of appeal"); *Dimond*, 792 F.2d at 193–94 (reversing the District Court's denial of post-judgment intervention where the intervenor sought to participate only at the appellate stage).

In this case, the District Court denied the United States' motion to intervene largely because it came after the court had already entered judgment in the case. *See Acree II*, 276 F. Supp. 2d at 98–99. The District Court noted that approximately two months had intervened between the May 7 Presidential Determination and the entry of final judgment for appellees, during which time the United States could have filed its motion. *See id.* However, in reaching this judg-

ment, the District Court failed to consider adequately the unique circumstances of this case.

In particular, the District Court failed to weigh the importance of this case to the United States' foreign policy interests and the purposes for which the Government sought to intervene. This is not a case in which the United States was simply seeking to weigh in on the merits. Rather, the Government's sole purpose in intervening was to raise a highly tenable challenge to the District Court's subject matter jurisdiction in a case with undeniable impact on the Government's conduct of foreign policy and to preserve that issue for appellate review.

In the face of these weighty interests, appellees assert no prejudice arising from the United States' intervention. Nor could they, given the District Court's independent obligation to assure itself of its own jurisdiction. The only result achieved by denial of the motion to intervene in this case is the effective insulation of the District Court's exercise of jurisdiction from all appellate review. In these circumstances, we find that the District Court abused its discretion in denying the United States' motion as untimely. *See United Airlines*, 432 U.S. at 395–96; *Smoke*, 252 F.3d at 470–71. In light of its clear foreign policy interests, the United States was entitled to intervene as of right pursuant to Rule 24. *See Roeder*, 333 F.3d at 233 (permitting the United States to intervene in a case implicating foreign policy concerns). We therefore reverse the decision of the District Court denying the United States' motion to intervene and turn to the merits of the Government's jurisdictional challenge.

### B. Subject Matter Jurisdiction Under the FSIA

It is uncontested that at the time appellees commenced their lawsuit in April 2002, the District Court had jurisdiction over the case under § 1605(a)(7), because appellees sought damages for injuries arising from alleged acts of torture that occurred while Iraq was designated as a state sponsor of terrorism. The United States now argues that § 1503 of the EWSAA, as implemented by the May 7 Presidential Determi-

nation, made § 1605(a)(7) inapplicable to Iraq and thereby divested the District Court of its jurisdiction in appellees' case. Appellees respond that § 1605(a)(7) is not a provision of law that falls within the scope of § 1503 of the EWSAA. Appellees alternatively contend that § 1503 and the Presidential Determination cannot be applied against them in this case without resulting in impermissible retroactive effects or violating constitutional principles of separation of powers. We review the District Court's exercise of jurisdiction *de novo*. *See Empagran S.A. v. F. Hoffman–LaRoche, Ltd.*, 315 F.3d 338, 343 (D.C. Cir. 2003).

In our view, while it is an exceedingly close question, the language of § 1503 of the EWSAA does not embrace the terrorism exception to the FSIA. We conclude that § 1503, read in the context of the EWSAA as a whole and its legislative history, is aimed at legal provisions that present obstacles to assistance and funding for the new Iraqi Government and was not intended to alter the jurisdiction of the federal courts under the FSIA.

This issue presents us with a basic question of statutory interpretation. We therefore begin with the language of the EWSAA. *See Holloway v. United States*, 526 U.S. 1, 6 (1999). Section 1503 provides, in its entirety:

> The President may suspend the application of any provision of the Iraq Sanctions Act of 1990: *Provided*, That nothing in this section shall affect the applicability of the Iran–Iraq Arms Non–Proliferation Act of 1992, except that such Act shall not apply to humanitarian assistance and supplies: *Provided further, That the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism*: *Provided further*, That military equipment, as defined by title XVI, section 1608(1)(A) of Public Law 102–484, shall not be exported under the authority of this section: *Provided further*, That section 307 of the Foreign

Assistance Act of 1961 shall not apply with respect to programs of international organizations for Iraq: *Provided further*, That provisions of law that direct the United States Government to vote against or oppose loans or other uses of funds, including for financial or technical assistance, in international financial institutions for Iraq shall not be construed as applying to Iraq: *Provided further*, That the President shall submit a notification 5 days prior to exercising any of the authorities described in this section to the Committee on Appropriations of each House of the Congress, the Committee on Foreign Relations of the Senate, and the Committee on International Relations of the House of Representatives: *Provided further*, That not more than 60 days after enactment of this Act and every 90 days thereafter the President shall submit a report to the Committee on Appropriations of each House of the Congress, the Committee on Foreign Relations of the Senate, and the Committee on International Relations of the House of Representatives containing a summary of all licenses approved for export to Iraq of any item on the Commerce Control List contained in the Export Administration Regulations, including identification of end users of such items: *Provided further*, That the authorities contained in this section shall expire on September 30, 2004, or on the date of enactment of a subsequent Act authorizing assistance for Iraq and that specifically amends, repeals or otherwise makes inapplicable the authorities of this section, whichever occurs first.

EWSAA § 1503, 117 Stat. 559, 579 (citations omitted) (emphasis added).  The controversy in this case concerns the second proviso of § 1503, authorizing the President to "make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or *any other provision of law that applies to countries that have supported terrorism*."  *Id.*

(emphasis added). The United States argues that this language embraces the authority to make § 1605(a)(7) inapplicable to Iraq, and that the President carried out that authority in the May 7 Presidential Determination.

The logic of this interpretation is straightforward: Section 1605(a)(7) creates an exception to the sovereign immunity normally enjoyed by foreign states in American courts for suits based on acts of torture or other terrorist acts. This exception applies only if the defendant foreign state was designated as a sponsor of terrorism at the time the acts took place. Section 1605(a)(7) is thus a "provision of law that applies to countries that have supported terrorism." The EWSAA authorizes the President to make such provisions inapplicable to Iraq, which authority the President exercised in the May 7 Determination. Section 1605(a)(7) therefore no longer applies to Iraq and cannot provide a basis for jurisdiction in appellees' case. *Quod erat demonstrandum.*

The difficulty with this view is that it focuses exclusively on the meaning of one clause of § 1503, divorced from all that surrounds it. This approach violates "the cardinal rule that a statute is to be read as a whole, since the meaning of statutory language, plain or not, depends on context." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) (citations omitted). In interpreting any statute, we must "'consider not only the bare meaning' of the critical word or phrase 'but also its placement and purpose in the statutory scheme.'" *Holloway*, 526 U.S. at 6 (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995)).

Traditional interpretive canons likewise counsel against a reading of the second proviso of § 1503 that ignores the context of § 1503 and the EWSAA as a whole. In particular, the canons of *noscitur a sociis* and *ejusdem generis* remind us that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (internal quotation marks and cita-

tions omitted). In addition, where statutory language is phrased as a proviso, the presumption is that its scope is confined to that of the principal clause to which it is attached. *See United States v. Morrow*, 266 U.S. 531, 534–35 (1925).

Applying the foregoing principles, we conclude that the scope of § 1503 is narrower than the Government suggests. The primary function of the EWSAA was to provide emergency appropriations in support of the United States' military operations in Iraq. The Act also provided additional funding for homeland security activities in the United States. Chapter 5 of the Act, entitled "Bilateral Economic Assistance," appropriated funds for a variety of assistance programs to Iraq and other American allies. *See* EWSAA, ch. 5, 117 Stat. 559, 572–81. In addition to the Iraq Relief and Reconstruction Fund, these programs included the Child Survival and Health Programs Fund, International Disaster Assistance, the Economic Support Fund (providing assistance to the governments of Jordan, Egypt, Turkey, the Philippines, and Afghanistan), Loan Guarantees to Israel, the Emergency Refugee and Migration Assistance Fund, peacekeeping operations, and similar activities. Thus, each program funded in Chapter 5 of the EWSAA addresses matters of bilateral economic assistance to Iraq and other countries. The United States points to nothing in this portion of the Act – or elsewhere in the EWSAA, for that matter – that addresses the jurisdiction of the federal courts.

Section 1503 is one of several "general provisions" within Chapter 5 of the EWSAA. *See* EWSAA §§ 1501–1506, 117 Stat. 559, 578–81. These "general provisions" all supply specific instructions or impose conditions upon the outlays of money appropriated throughout the Chapter. For example, § 1501 provides that the President has authority to transfer money between the several programs funded in the Chapter, upon proper notification to Congress. Section 1502 provides that "[a]ssistance or other financing under this chapter may be provided for Iraq notwithstanding any other provision of law," subject to certain provisos. Section 1504 authorizes the President to export certain nonlethal military equipment to Iraq, notwithstanding any other provision of law, subject to

certain conditions and reporting requirements. Section 1503 thus finds itself situated among several other provisions that govern the distribution of assistance to Iraq within the context of ongoing military operations and against a backdrop of legal obstacles that would otherwise prohibit such assistance.

Section 1503 itself authorizes the President to suspend the application of any provision of the Iraq Sanctions Act of 1990, subject to eight provisos. *See* EWSAA § 1503, 117 Stat. 559, 579. Three of the provisos impose notification or reporting requirements and provide for expiration of the suspension authority granted in § 1503. The remaining provisos are each responsive to a specific aspect of the ISA or other statutes that are implicated by the suspension authority granted in § 1503, thereby resolving potential ambiguities that may arise in the statutory landscape as a result of the suspension of the ISA. Thus, the first proviso, stating that nothing in § 1503 shall affect the applicability of the Iran–Iraq Arms Non–Proliferation Act of 1992, reflects the fact that portions of the Non–Proliferation Act incorporate the ISA by reference and are to remain in effect despite suspension of the ISA. *See* Iran–Iraq Arms Non–Proliferation Act of 1992, Pub. L. No. 102–484, §§ 1601–08, 106 Stat. 2315, 2571–75 (codified at 50 U.S.C. § 1701 note (2000)). Similarly, the fifth proviso states that "provisions of law that direct the United States Government to vote against or oppose loans or other uses of funds, including for financial or technical assistance, in international financial institutions for Iraq shall not be construed as applying to Iraq." This language responds in part to § 586G(a)(5) of the ISA, which requires the United States to oppose any loan or financial or technical assistance to Iraq by international financial institutions, pursuant to other provisions of law incorporated into the ISA. *See* ISA § 586G(a)(5), 104 Stat. 1979, 2052. This fifth proviso thus makes clear that the President may suspend not only the ISA, but also those provisions of law that are incorporated by reference into the ISA's prohibition on American support for assistance to Iraq from international financial institutions. The remaining provisos are similarly tied to specific features

of the ISA and the other statutes with which the ISA interacts.

The second proviso of § 1503 – which lies at the heart of the controversy in the instant case – provides that "the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961 or any other provision of law that applies to countries that have supported terrorism." Just like the other provisos in § 1503, this language is responsive to a particular section of the ISA. As we have seen, the ISA required that certain enumerated provisions of law, including § 620A of the Foreign Assistance Act of 1961, and "all other provisions of law that impose sanctions against a country which has repeatedly provided support for acts of international terrorism" be fully enforced against Iraq. *See* ISA § 586F(c), 104 Stat. 1979, 2051. The second proviso in § 1503 thus makes clear that the authority in § 1503 to suspend the ISA includes the authority to make inapplicable to Iraq § 620A of the FAA and those additional provisions of law incorporated into § 586F(c) of the ISA.

As previously noted, § 620A of the FAA prohibits the grant of assistance to any country determined by the Secretary of State to have "repeatedly provided support for acts of international terrorism." 22 U.S.C. § 2371(a). A survey of the other provisions enumerated in § 586F(c) of the ISA indicates that all of those provisions deal with restrictions on assistance to state sponsors of terrorism. These provisions include § 40 of the Arms Export Control Act, 22 U.S.C. § 2780 (2000); §§ 555 and 556 of the Foreign Operations, Export Financing, and Related Programs Appropriations Act of 1991, Pub. L. No. 101–513, §§ 555–556, 104 Stat. 1979, 2021–22 (1990); and § 555 of the International Security and Development Cooperation Act of 1985, Pub. L. No. 99–83, § 555, 99 Stat. 190, 227. Each of these provisions calls for the imposition of economic sanctions on countries that are determined to have supported international terrorism, including restrictions on exports, aviation boycotts, and prohibitions on loans, credits, or other financial assistance. Read within this context, the reference in the ISA to "all other provisions of law that impose sanctions against a country which has repeatedly provided sup-

port for acts of international terrorism" is best read to denote provisions of law that call for economic sanctions and prohibit grants of assistance to state sponsors of terrorism.

To recapitulate, the meaning of the disputed language in § 1503, like each of the other substantive provisos in that section, is thus illuminated by consideration of the corresponding provisions of the ISA. *See Morrow*, 266 U.S. at 534–35 ("The general office of a proviso is to except something from the enacting clause, or to qualify and restrain its generality and prevent misinterpretation. Its grammatical and logical scope is confined to the subject-matter of the principal clause.") (citations omitted). The reference in § 586F(c) of the ISA to § 620A of the FAA and "all other provisions of law" that impose sanctions on state sponsors of terrorism appears clearly to encompass laws which, like the FAA and the other enumerated provisions, impose obstacles to assistance to designated countries. None of these provisions remotely suggests any relation to the jurisdiction of the federal courts. Thus, when read in juxtaposition with this portion of the ISA, the second proviso of § 1503 is more persuasively interpreted as sharing a similar scope. That is, it authorizes the President to make inapplicable with respect to Iraq those provisions of law that impose economic sanctions on Iraq or that present legal obstacles to the provision of assistance to the Iraqi Government. This interpretation reflects a central function of Chapter 5 of the EWSAA, which is to provide for relief and reconstruction in post-war Iraq.

Although sparse, the legislative history of § 1503 of the EWSAA likewise supports our interpretation of the disputed language in § 1503. The EWSAA began as a request from the President to Congress for emergency supplemental appropriations to support Department of Defense operations in Iraq and for other purposes. *See* Letter from President George W. Bush to Rep. Dennis Hastert, Speaker of the House of Representatives (Mar. 25, 2003), *reprinted in* H.R. Doc. No. 108–55, at 1 (2003). The portion of the President's request dealing with bilateral economic assistance included language repealing the Iraq Sanctions Act of 1990, subject to

the proviso "[t]hat the President may make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961, as amended, or other provision of law that applies to countries that have supported terrorism." H.R. Doc. No. 108–55, at 24. The request explained that this language would "authorize the President to make inapplicable with respect to Iraq section 620A, and section 620G, and section 307 of the Foreign Assistance Act." *Id.*

One week after the President issued this request for supplemental appropriations, the Committees on Appropriations of the Senate and House reported bills that each contained language similar to that proposed by the President. The Senate version, reported on April 1, 2003, repeated exactly the language of the President's request, repealing the ISA and authorizing the President to "make inapplicable with respect to Iraq section 620A of the Foreign Assistance Act of 1961, as amended, or other provision of law that applies to countries that have supported terrorism." S. 762, 108th Cong. § 503 (2003). The accompanying committee report explained that this section of the Senate bill "provide[d] the request for the repeal of the Iraqi Sanctions Act of 1990 [sic], and *other limitations on assistance for Iraq*." S. Rep. No. 108–33, at 21 (2003) (emphasis added). The House version, reported on April 2, 2003, included the same language that became § 1503 of the EWSAA. *See* H.R. 1559, 108th Cong. § 1402 (2003). The committee report accompanying the House bill explained that this language was "similar to the authority requested by the President that would repeal the Iraq Sanctions Act of 1990 and authorize the President to make inapplicable with respect to Iraq section 620A and section 307 of the Foreign Assistance Act." H.R. Rep. No. 108–55, at 30 (2003).

The Conference Committee agreed to the language proposed in the House version of the supplemental appropriation. *See* H.R. Conf. Rep. No. 108–76, at 21 (2003). The conferees reported that § 1503 of the conference agreement "would make inapplicable the Iraq Sanctions Act of 1990 and authorize the President to make inapplicable with respect to Iraq section 620A and section 307 of the Foreign Assistance Act."

*Id*. at 76. The language of the conference agreement was passed by both houses on April 12, 2003, without further amendment to § 1503, and signed by the President on April 16, 2003.

While not conclusive, this legislative history bolsters our conclusion as to the scope of § 1503. There is no reference in the legislative history to the FSIA in particular or to federal court jurisdiction in general. Rather, the legislative history of the EWSAA reflects an underlying legislative concern with eliminating statutory restrictions on aid and exports needed for the reconstruction of Iraq. This concern is easily understood. Any effort by the United States Government or private businesses in the United States to provide assistance or conduct business with the new Iraqi regime, in the absence of § 1503, would be barred by numerous provisions of law until such time as the President and the Secretary of State could make the necessary certifications to Congress to remove Iraq's designation as a state sponsor of terrorism. *See, e.g.*, 22 U.S.C. § 2371(c) (rescission provisions of the Foreign Assistance Act of 1961); 50 U.S.C. App. § 2405(j)(4) (rescission provisions of the Export Administration Act). Section 1503 permits assistance and reconstruction efforts to proceed without waiting for this lengthy and complex certification process to run its course by setting aside the ISA and "other limitations on assistance for Iraq," S. REP. No. 108–33, at 21 (2003). This legislative history, along with the other provisions in § 1503, the EWSAA as a whole, and the complex web of economic sanctions and prohibitions on assistance that previously applied to Iraq thus supports our interpretation that the general reference in § 1503 to "other provision[s] of law that appl[y] to countries that have supported terrorism" embraces only those provisions of law that constitute legal restrictions on assistance to and trade with Iraq.

Because we find, as a matter of statutory interpretation, that § 1503 does not make the terrorism exception to the FSIA inapplicable to Iraq, we need not consider whether § 1503 operates retroactively to appellees' pending lawsuit. Nevertheless, comparison of the temporal scope of 28 U.S.C. § 1605(a)(7) with that of § 1503 lends further support to our

resolution of the statutory interpretation issue. The language of § 1503 is broad, general, and unclear. Yet, the United States seeks to employ it to supersede the much more precise language of § 1605(a)(7), which already provides in quite specific terms for the prospective restoration of sovereign immunity once a country is decertified as a sponsor of terrorism. Specifically, § 1605(a)(7) provides that the terrorism exception to foreign sovereign immunity arises only when a defendant country is designated as a sponsor of terrorism "at the time the act occurred, unless later so designated as a result of such act." 28 U.S.C. § 1605(a)(7)(A). Thus, the FSIA specifically provides that when a country, once designated as a state sponsor of terrorism, is subsequently restored to good standing, that country is still amenable to suit for acts that took place prior to the restoration of its sovereign immunity. As the United States would have it, however, waiver of § 1605(a)(7) in the case of Iraq pursuant to § 1503 would restore Iraq's immunity even for acts that occurred while Iraq was still considered a sponsor of terrorism.

This perplexing result appears even more bizarre when the sunset provisions of § 1503 are taken into account. The final proviso in § 1503 states that "the authorities contained in this section shall expire on September 30, 2004, or on the date of enactment of a subsequent Act authorizing assistance for Iraq and that specifically amends, repeals or otherwise makes inapplicable the authorities of this section, whichever occurs first." EWSAA § 1503, 117 Stat. 559, 579. If the United States were correct in its interpretation of § 1503, then this sunset provision would mean that, absent intervening events, § 1605(a)(7) would once again be available as a basis of jurisdiction after September 30, 2004. At such time, the District Court would properly have jurisdiction over a suit against Iraq based on events that occurred while Iraq was designated as a state sponsor of terrorism. It makes little sense to say that between the date of the May 7 Presidential Determination and the date of expiration of the authorities conferred in § 1503, there is no federal court jurisdiction for suits against Iraq, but that after that period elapses, such suits will again be available. Yet, this is precisely the result

that follows if one imposes the unwieldy language of § 1503 upon the otherwise careful and precise scheme established under the FSIA. Thus, considerations of temporal scope weigh in favor of an interpretation of § 1503 that avoids this conflict.

The United States contends that, even if the disputed clause in § 1503 must be construed to reach only those provisions of law that are similar in nature to the legal restrictions on assistance to Iraq that are enumerated elsewhere in § 1503, the terrorism exception to the FSIA still falls within the scope of provisions the President is authorized to make inapplicable to Iraq. Specifically, the United States points out that § 1605(a)(7) shares a "criterion of similarity" with the other provisions mentioned in § 1503, Reply Br. at 17, namely, that it is a provision of law that imposes penalties on foreign nations as a result of their designation as sponsors of terrorism. This contention has some attraction, because § 1605(a)(7) arguably poses a threat of a sort to American reconstruction efforts in Iraq by providing jurisdiction in American courts for cases seeking huge liability judgments against the Iraqi Government. Under this view, it is plausible to suggest that § 1503 encompasses the terrorism exception to the FSIA.

It is true that section 1605(a)(7) is not totally dissimilar to laws imposing economic sanctions or prohibitions on assistance and trade, in that it penalizes countries designated as supporters of terrorism. However, even if the FAA and the other economic penalties discussed above could be said to share this single common attribute with § 1605(a)(7), the FSIA's rules of federal court jurisdiction would still be several steps removed from those other provisions, which are all much more closely analogous to one another. Because § 1503, the EWSAA as a whole, and the relevant legislative history all reflect an overriding concern for economic assistance, trade, and reconstruction in Iraq, we find that this context counsels against a reading of § 1503 that stretches so far as to reach a law, like the FSIA, that is largely dissimilar to all of the "look-alike" provisions affected by § 1503.

We conclude that when § 1503 is read in the context of the other provisions of the EWSAA and its legislative history, as it must be, that provision is best understood as applying only to legal restrictions on assistance and funding for the new Iraqi Government. There is nothing in the language of § 1503, the EWSAA as a whole, or its legislative history to suggest that Congress intended by this statute to alter the jurisdiction of the federal courts under the FSIA. We acknowledge that this is a close question. We nevertheless conclude that § 1503 was not intended to apply to § 1605(a)(7). The scope of the May 7 Presidential Determination is immaterial, because it cannot exceed the authority granted in § 1503. We therefore affirm the District Court's exercise of jurisdiction over appellees' claims under 28 U.S.C. § 1605(a)(7).

### C. Cause of Action

Having concluded that jurisdiction in this case properly lies in the District Court, we arrive at the clear conflict between the District Court's judgment in favor of appellees and this court's recent holding in *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.3d 1024. In *Cicippio*, we held that neither § 1605(a)(7) nor the Flatow Amendment, nor the two considered together, supplies a cause of action against foreign states. *See* 353 F.3d at 1033. In the instant case, the District Court predicated its finding of liability on precisely those provisions, and appellees point to no alternative cause of action. We therefore conclude that appellees have failed to state a cause of action.

Because of the default of the Iraqi defendants, no party questioned the existence of appellees' cause of action during the proceedings in the District Court. Nor did the United States raise this issue in its motion to intervene. Nevertheless, no party contests this court's discretion to reach this issue on our own motion in light of the intervening change in law.

Appellees rightly contend that non-jurisdictional defenses such as the failure to state a cause of action are waivable and that courts generally do not permit parties to raise such

issues for the first time on appeal. The right of a party to *advance* this objection is not coextensive with the discretion of the court to *consider* the issue, however. As we have held, "[c]ourts of appeals are not rigidly limited to issues raised in the tribunal of first instance; they have a fair measure of discretion to determine what questions to consider and resolve for the first time on appeal." *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 n.5 (D.C. Cir. 1992) (addressing the existence of a cause of action for the first time on appeal in light of a relevant intervening Supreme Court decision). Thus, while we will ordinarily refrain from reaching non-jurisdictional questions that have not been raised by the parties or passed on by the District Court, we may do so on our own motion in "exceptional circumstances." *Id.* ("Qualifying circumstances include . . . an intervening change in the law. . . .").

Our intervening decision in *Cicippio*, which definitively resolved a previously open question of law that we find to be dispositive in appellees' case, surely qualifies as the type of exceptional circumstance that justifies our exercise of discretion. *See id.* at 419. The issue before us is "purely one of law important in the administration of federal justice, and resolution of the issue does not depend on any additional facts not considered by the district court." *Id.* at 419 n.5. The circumstances of this case are even more extraordinary when one considers the stakes: Appellees have obtained a nearly-billion dollar default judgment against a foreign government whose present and future stability has become a central preoccupation of the United States' foreign policy. In these circumstances, it would be utterly unseemly for this court to ignore the clear implications of our holding in *Cicippio*. We therefore find it appropriate to exercise our discretion to determine whether appellees' case must be dismissed for failure to state a cause of action.

In their complaint, appellees premised their claim of liability on § 1605(a)(7), as amended, asserting that this provision "creates a federal cause of action for torture . . . of American nationals, or for the benefit of American national claimants, when such acts are committed by a foreign state designated

as a state sponsor of terrorism." Compl. ¶ 596, J.A. 143. The complaint pointed to several decisions of the District Court that proceeded on the assumption that § 1605(a)(7), as amended by the Flatow Amendment, "not only waives sovereign immunity and provides jurisdiction but also creates a cause of action within its scope of applicability." *Id.* While appellees also alluded to the "traditional torts of assault, battery and intentional infliction of emotional distress" in their generic form, Compl. ¶ 597, J.A. 143, they did not point to any other specific source in state, federal, or foreign law for their cause of action.

The District Court similarly relied on § 1605(a)(7) and the Flatow Amendment, finding that those provisions "create[ ] a federal cause of action against officials, employees and agents of a foreign state, as well as the state and its agencies and instrumentalities themselves." *Acree I*, 271 F. Supp. 2d at 215. In company with appellees, the District Court reasoned that "[s]uits brought under § 1605(a)(7) may be based on conventional common law torts such as assault, battery, and intentional infliction of emotional distress," *id.*, and found that the facts appellees alleged satisfied the elements of several such torts, *see id.* at 215–17. The District Court cited no alternative cause of action.

In *Cicippio*, we held that neither § 1605(a)(7) nor the Flatow Amendment, nor the two together, creates a cause of action against foreign states themselves. *See Cicippio*, 353 F.3d at 1033. This holding applies also to suits against "agenc[ies] or instrumentalit[ies]" of a foreign state, which are included in the FSIA's definition of "foreign state," *see* 28 U.S.C. § 1603(a), (b); *see also Roeder*, 333 F.3d at 234 (explaining that an official state entity whose core functions are governmental is treated as the foreign state itself for purposes of the FSIA); Compl. ¶ 3, J.A. 33 (stating that the Iraqi Intelligence Service is an agency or instrumentality of Iraq and therefore also a "foreign state" within the meaning of the FSIA). *Cicippio* also made clear that any suit against an official of a foreign state must be a suit in that official's *personal* capacity. *See* 353 F.3d at 1034; *cf.* Compl. ¶¶ 2–3, J.A. 31–33 (naming as a defendant Saddam Hussein "in his

official capacity as President of the Republic of Iraq."). The causes of action advanced by appellees before the District Court therefore do not suffice to state claims for which relief may be granted.

In response to our order to consider this issue in preparation for oral argument, appellees did not advance any alternative causes of action. At oral argument, counsel for appellees gestured again toward generic common law torts, *see* Oral Argument Tr. at 23–29, but generic common law cannot be the *source* of a federal cause of action. The shared common law of the states may afford useful guidance as to the rules of decision in a FSIA case where a cause of action arises from some specific and concrete source of law. *See Bettis*, 315 F.3d at 333 (assuming, *arguendo*, that plaintiffs stated a cause of action under the Flatow Amendment and then turning to generic common law to flesh out the controlling substantive law). But there is no support for the proposition that generic common law itself may furnish the cause of action. Rather, as in any case, a plaintiff proceeding under the FSIA must identify a particular cause of action arising out of a specific source of law. Appellees failed to do so in this case.

Here, appellees pointed to no source of liability other than § 1605(a)(7) and the Flatow Amendment. When pressed repeatedly at oral argument, appellees offered no coherent alternative. We therefore find no cause to remand this case to the District Court in order to allow appellees to amend their complaint to state a cause of action under some other source of law. *See Cicippio*, 353 F.3d at 1036. In *Cicippio*, we permitted such a remand because the state of the law at the time of that appeal "may have . . . misled" the plaintiffs in that case into assuming that the Flatow Amendment afforded a cause of action against the foreign state defendant. *See id.* In addition, we noted that *amici* in that case had advanced the possibility that an alternative source of law might supply a viable cause of action. *See id.* In this case, by contrast, our decision in *Cicippio* and our order to the parties prior to oral argument put appellees on notice of this issue. Despite this notice, appellees offered no alternative cause of action when

asked to do so at oral argument. Accordingly, appellees' suit must be dismissed for failure to state a cause of action.

### III. CONCLUSION

We are mindful of the gravity of appellees' allegations in this case. That appellees endured this suffering while acting in service to their country is all the more sobering. Nevertheless, we cannot ignore the magnitude of their default judgment or its impact on the United States' conduct of foreign policy where the law is indisputably clear that appellees were not legally entitled to this judgment. We reverse the order of the District Court denying the United States' motion to intervene, *Acree II*, 276 F. Supp. 2d. 95. We vacate the District Court's judgment for appellees, *Acree I*, 271 F. Supp. 2d 179, and dismiss appellees' suit against the Republic of Iraq, the Iraqi Intelligence Service, and Saddam Hussein in his official capacity as President of Iraq on the grounds that appellees have failed to state a cause of action.

*So ordered.*

ROBERTS, *Circuit Judge*, concurring in part and concurring in the judgment: I agree with the majority that the district court erred in denying the United States' motion to intervene. I also concur in the court's judgment of dismissal, but I reach that result by a different path than the majority has taken. In my view, Section 1503 of the EWSAA includes the authority to make Section 1605(a)(7) of the FSIA—on its face a "provision of law that applies to countries that have supported terrorism"—inapplicable to Iraq, and the Presidential Determination of May 7, 2003 therefore ousted the federal courts of jurisdiction in cases that relied on that exception to Iraq's sovereign immunity. I also conclude that this ouster of jurisdiction is properly applied to pending cases, and that the district court's judgment should thus be vacated and the case dismissed for want of jurisdiction.

## A.   The Scope of Section 1503 of the EWSAA

1.   The pertinent language of Section 1503 is straightforward, authorizing the President to make inapplicable to Iraq Section 620A of the Foreign Assistance Act of 1961 and "*any* other provision of law that applies to countries that have supported terrorism" (emphasis added). As this court recently observed, "the Supreme Court has consistently instructed that statutes written in broad, sweeping language should be given broad, sweeping application." *Consumer Elecs. Ass'n v. FCC*, 347 F.3d 291, 298 (D.C. Cir. 2003). "Any other provision" should be read to mean "any other provision," not, as the majority would have it, "provisions that present obstacles to assistance and funding for the new Iraqi Government." Slip op. at 16.

This is particularly true given that Congress knows how to use more limited language along the lines of the majority's construction when it wants to. Congress did just that in another appropriations statute enacted just two months prior to the EWSAA. In that statute, Congress declared that certain restrictions on funding to foreign countries should not be construed to restrict assistance to nongovernmental organizations in those countries, but provided that this easing of restrictions would not apply "with respect to section 620A of the Foreign Assistance Act of 1961 or any *comparable* provision of law *prohibiting assistance* to countries that support

international terrorism." Consolidated Appropriations Resolution, 2003, Pub. L. No. 108-7, Div. E, § 537(c)(1), 117 Stat. 11, 196 (Feb. 20, 2003) (emphases added). The EWSAA, of course, refers to the very same section of the Foreign Assistance Act but includes substantially broader language in its subsequent catchall phrase. This use of different language in two statutes so analogous in their form and content, enacted so close in time, suggests that the statutes differ in their meaning, and that the facially broader language was in fact intended to have the broader scope.

2. The majority notes that Section 1605(a)(7) of the FSIA already "specifically provides that when a country, once designated as a state sponsor of terrorism, is subsequently restored to good standing, that country is still amenable to suit for acts that took place prior to the restoration of its sovereign immunity." Slip op. at 25. The majority then concludes that the general power conferred by Section 1503 of the EWSAA should not be read to authorize the President to restrike this previously-fixed balance between the interests of a newly non-terrorist state and those of victims of terrorism.

I respectfully disagree. The majority's reading simply assumes that the balance Congress struck in 1996 was left untouched by the EWSAA. In 2003, however, Congress *for the first time* confronted the prospect that a friendly successor government would, in its infancy, be vulnerable under Section 1605(a)(7) to crushing liability for the actions of its renounced predecessor. *See* U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 1999, at 2 (April 2000) (noting that the list of state sponsors of terrorism had been unchanged since 1993); U.S. DEP'T OF STATE, PATTERNS OF GLOBAL TERRORISM 2001, at 63 (May 2002) (listing the same states). Certainly there is no evidence indicating that, when it enacted Section 1605(a)(7), Congress contemplated that a successor government's cessation of support for terrorism would come about under circumstances like those in Iraq. Given the broad language of the EWSAA and the circumstances surrounding its enactment, it is entirely possible—and surely not "perplexing," slip op. at 25—that Congress in 2003 made an *ad hoc*

decision to strike a different balance in favor of the new government of Iraq.  The whole point of Section 1503 was to change existing rules to respond to new realities; it is not a compelling argument against a construction of the section to object that it would do just that.

3.  The majority further finds that construing the EWSAA to authorize an ouster of jurisdiction over Iraq in Section 1605(a)(7) cases would be "bizarre" in light of the sunset provisions of Section 1503.  Slip op. at 25.  "[A]bsent intervening events," the majority states, "[Section] 1605(a)(7) would once again be available as a basis of jurisdiction after September 30, 2004."  *Id.* Given the range of possibilities contained in the majority's careful caveat, the prediction itself is overwrought.  As one member of Congress has explained, in relation to a different statute, "[s]unsetting laws does not mean repealing them.  Laws would only expire if Congress failed to meet its responsibility to reexamine and renew these statutes within a specified period of time."  S. REP. NO. 104-85, at 64 (1995) (statement of Sen. Grams).

One need look no further than the title of the EWSAA to discern its emergency nature; a sunset provision in such a statute is intended to buy time for fuller consideration of the issues, rather than to establish an immutable date for the statute's presumed extinction.  And it hardly needs saying that the sunset provision in Section 1503 applies not only to the proviso at issue in this case, but to all of that section.  If the majority's prediction of abject congressional lassitude is accurate, the Iraq Sanctions Act of 1990 will itself return to full strength on September 30, 2004.  Nothing in the ISA requires that Iraq be included on the State Department's list of state sponsors of terrorism, so even an orderly de-listing of Iraq by the executive branch under the procedures of 22 U.S.C. § 2371(c) would not alter the ISA's restrictions on assistance.  In short, the occurrence of "intervening events" is far more likely than their absence.

4.  I agree with the majority that this question of statutory interpretation is close, and I do not suggest that the EWSAA is entirely unambiguous.  But the plaintiffs err in their

assumption that the government must somehow prove that Congress intended the statute's broad terms to be construed broadly. *See* Appellees' Br. at 25 ("There is no indication that the proviso [in Section 1503] was intended to be a broad tool of foreign policy involving a retroactive restoration of sovereign immunity"); *cf.* slip op. at 24 ("There is no reference in the legislative history [of Section 1503] to the FSIA in particular or to federal court jurisdiction in general."). The burden is precisely the opposite: the party seeking to narrow the application of the statute must demonstrate that Congress intended something less than what the law on its face says. *See, e.g.*, *Harrison v. PPG Industries*, 446 U.S. 578, 589 (1980) ("[T]he phrase, 'any other final action,' in the absence of legislative history to the contrary, must be construed to mean exactly what it says"). And as this court has stated, "the plainer the language, the more convincing contrary legislative history must be." *Cole v. Harris*, 571 F.2d 590, 597 (D.C. Cir. 1977) (internal quotation marks and citation omitted).

*Harrison* in fact resembles this case in significant respects: the Court was interpreting an amendment to the Clean Air Act that provided for review, in the appropriate federal court of appeals, of "locally and regionally applicable actions" taken by the Environmental Protection Agency "under specifically enumerated provisions of the Act, and of '*any other final action* of the [EPA under the Act] . . . which is locally or regionally applicable.'" 446 U.S. at 579 (quoting 42 U.S.C. § 7607(b)(1) (1976 & Supp. II)) (emphasis and ellipsis in original). The respondents, citing the *ejusdem generis* canon of interpretation (the corollary *noscitur a sociis* was not then in vogue), urged the court to construe the phrase "any other final action" to mean only final actions similar to those specifically identified in the statute. *Id.* at 587. The Court refused, noting that the *ejusdem generis* canon should be applied only when the meaning of the text is uncertain and finding "no uncertainty in the meaning of the phrase, 'any other final agency action.'" *Id.* at 588.

Significantly, the Court also rejected the respondents' argument—based on the "scant" legislative history of the

amendment—that it was "unlikely . . . that Congress would have expanded so radically the jurisdiction of the courts of appeals, and divested the district courts of jurisdiction, without some consideration and discussion of the matter." *Id.* at 591, 592. "In ascertaining the meaning of a statute," the Court stated, "a court cannot, in the manner of Sherlock Holmes, pursue the theory of the dog that did not bark." *Id.* at 592. The Court concluded that the statutory language meant "exactly what it sa[id], namely, *any other* final action." *Id.* at 589 (emphasis in original).

More recently, the Court unanimously rejected the suggestion that certain broad terms of the Federal Power Act (FPA) should be construed narrowly in light of Congress's focused intent to overrule one of the Court's prior cases: "[E]ven if [the prior case] catalyzed the enactment of the FPA, [it] does not define the outer limits of the statute's coverage." *New York v. FERC*, 535 U.S. 1, 21 (2002). In my view, *Harrison* and *New York* illustrate the appropriate approach to a broadly worded statute such as Section 1503 of the EWSAA. The absence of any reference to the FSIA in the legislative history does not compel the conclusion that Section 1503 does not reach it, and the fact that Congress may have been focused primarily on removing barriers to the flow of aid to Iraq does not mean that the statute refers exclusively to such barriers. *See PGA Tour, Inc. v. Martin*, 532 U.S. 661, 689 (2001) ("the fact that a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth.") (quoting *Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998)).[1] Because the legislative history contains no "convincing" indication, *Cole*, 571 F.2d at 597, that Congress did *not* intend to include Section 1605(a)(7) of the FSIA among the "any other" provisions that the President could render inapplicable to Iraq, I conclude that the President was authorized to—and did, with

---

[1] Application of the *ejusdem generis* canon seems particularly inappropriate in this case because the statute provides only one point of reference (Section 620A of the Foreign Assistance Act) from which to extrapolate.

the Presidential Determination—oust the federal courts of jurisdiction over Iraq in Section 1605(a)(7) cases.

5.  I do not mean to suggest that the contrast between the language of the Consolidated Appropriations Resolution and that of the EWSAA is conclusive proof of Congress's intent—but then neither is the majority's invocation of the pre-existing balance struck in Section 1605(a)(7).  I appreciate that my view of Congress's purpose in restriking that balance is necessarily speculative—but then so is the majority's more limited view of Congress's purpose to reach only aid statutes. The majority can cite *United States v. Morrow*, 266 U.S. 531 (1925), for a presumption that supports its construction of the pertinent proviso, *see* slip op. at 19, 22—but I can respond with a case of similar vintage for the opposite proposition that "a frequent use of the proviso in Federal legislation [is] to introduce … new matter extending rather than limiting or explaining that which has gone before." *Interstate Commerce Comm'n v. Baird*, 194 U.S. 25, 37 (1904).  And both I and the majority (and everyone else, for that matter) are on tenuous ground when it comes to predicting whether Congress will act prior to the sunset date in Section 1503.[2]

---

[2]  There is of course an established framework that governs judicial review of statutory interpretations by agencies in the executive branch.  *See Chevron USA Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984).  In such circumstances, we defer to any reasonable construction adopted by the entity Congress has entrusted with administering the statute.  *Id.* at 843–45.  There is no doubt that the President's interpretation of Section 1503 to cover Section 1605(a)(7) is at least a reasonable one.  The applicability of *Chevron* to presidential interpretations is apparently unsettled, *see Chamber of Commerce of the United States v. Reich*, 74 F.3d 1322, 1325 (D.C. Cir. 1996); Note, *Extending* Chevron *Deference to Presidential Interpretations of Ambiguities in Foreign Affairs and National Security Statutes Delegating Lawmaking Power to the President*, 86 CORNELL L. REV. 411 (2001), but it is interesting to note that this would be an easy case had the EWSAA provided that, say, the Secretary of State may exercise the authority conferred under Section 1503.  It is puzzling why the case should be so much harder when the authority is given to the Secretary's boss.

In such circumstances I prefer to rest on the firmer foundation of the statutory language itself. Give me English words over Latin maxims. The words here—"any other provision of law that applies to countries that have supported terrorism"—are, even if not entirely unambiguous, plain enough to impose a heavy burden on those who would rely on canons, or structure, or assumed purposes to conclude the words do not reach a law that applies, by its terms, to a foreign state "designated as a state sponsor of terrorism." 28 U.S.C. § 1605(a)(7)(A). The majority ably marshals the arguments on the other side, but at the end of the day I find greater solace in the words themselves. *See Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("canons of construction are no more than rules of thumb that help courts determine the meaning of legislation, and in interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").[3]

## B. Application to Pending Cases

The plaintiffs argue that even if Section 1503 is properly read to include an ouster of jurisdiction under the FSIA, applying the statute to pending cases such as this one would be impermissibly retroactive under *Landgraf v. USI Film Products*, 511 U.S. 244 (1994). This court reviewed the applicability of the *Landgraf* framework to jurisdictional stat-

---

[3] The plaintiffs argue that the grant of such authority to the President is unconstitutional in light of *Clinton v. New York*, 524 U.S. 417 (1998), because such a grant would empower the President "to change the text of § 1605(a)(7) so that Iraq's immunity no longer turns on its status at the time the act occurred" or to "repeal[ ] § 1605(a)(7) solely as it relates to Iraq." Appellees' Br. at 50. The actions authorized by the EWSAA are a far cry from the line-item veto at issue in *Clinton*, and are instead akin to the waivers that the President is routinely empowered to make in other areas, particularly in the realm of foreign affairs. *See, e.g.*, 22 U.S.C. § 7207(a)(3) (authorizing the President to waive a statutory prohibition on assistance to certain countries if he determines that a waiver is in the national security interest).

utes in *LaFontant v. INS*, 135 F.3d 158 (D.C. Cir. 1998), and concluded that the pertinent question—assuming Congress had not explicitly addressed retroactivity—was whether the statute spoke to the power of the court or instead to the substantive rights of the parties. Retroactive application is permissible in the former case, but not the latter. *Id.* at 163.

We recently held that Section 1605(a)(7) of the FSIA is solely a jurisdictional provision that creates no cause of action and does not affect the substantive law determining the liability of a foreign state. *Cicippio-Puleo v. Islamic Republic of Iran*, 353 F.2d 1024, 1033–34 (D.C. Cir. 2004). Rendering Section 1605(a)(7) inapplicable, therefore, can only affect the power of the court and not the substantive rights of the parties. Application of the EWSAA to Section 1605(a)(7) is accordingly not impermissibly retroactive with respect to pending cases.

Moreover, the concern animating the Supreme Court's retroactivity jurisprudence is that "settled expectations should not be lightly disrupted." *Landgraf*, 511 U.S. at 265 (footnote omitted). At the time of the primary conduct at issue here, the jurisdictional grant of Section 1605(a)(7) did not even exist. We now know that the cause of action plaintiffs invoke did not exist then or now. *Cicippio*, 353 F.3d at 1033–34; *see* slip op. at 27–31. Any claim plaintiffs could have brought was in any event always subject to compromise or abrogation by the Executive. *See American Ins. Ass'n v. Garamendi*, 123 S. Ct. 2374, 2386–87 (2003); *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981). Under these circumstances, there is no impediment to application of the normal rule that provisions addressing the power of a court be given retroactive effect.

\* \* \*

For the foregoing reasons, I would hold that Section 1503 of the EWSAA and the Presidential Determination deprived the courts of jurisdiction over suits against Iraq under Section 1605(a)(7), and that the new jurisdictional rule applies to pending cases, including this one. I therefore agree that the

judgment of the district court should be vacated and the case dismissed.